## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

LEAGUE OF WOMEN VOTERS OF THE
UNITED STATES, LEAGUE OF
WOMEN VOTERS OF ALABAMA, LEAGUE
OF WOMEN VOTERS OF GEORGIA,
LEAGUE OF WOMEN VOTERS OF KANSAS,
GEORGIA STATE CONFERENCE OF THE
NAACP, GEORGIA COALITION FOR THE
PEOPLE'S AGENDA, MARVIN BROWN, JOANN
BROWN and PROJECT VOTE

               Plaintiffs,

   vs.

BRIAN D. NEWBY, in his capacity as the Acting
Executive Director & Chief Operating Officer of The
United States Election Assistance Commission; and

THE UNITED STATES ELECTION ASSISTANCE
COMMISSION

               Defendants.

Case No.

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs League of Women Voters of the United States, League of Women Voters of Alabama, League of Women Voters of Georgia, League of Women Voters of Kansas, the Georgia State Conference of the NAACP, the Georgia Coalition for the People's Agenda, Marvin Brown, JoAnn Brown and Project Vote (collectively, the "Plaintiffs") bring this Complaint for declaratory and injunctive relief, including a temporary restraining order and preliminary injunctive relief, and allege as follows:

1.      Mr. Brian Newby, the Executive Director ("Executive Director") of the U.S. Election Assistance Commission ("EAC" or "Commission"), has unlawfully modified the national uniform mail-in voter registration form ("Federal Form") prescribed by the National Voter Registration Act of 1993, 52 U.S.C. § 20501 *et seq.* ("NVRA").  On January 29, 2016, the Executive Director unilaterally granted requests by Alabama, Georgia and Kansas (collectively, the "States") to modify the Federal Form's instructions to require voter registration applicants in those States to submit documentary proof of U.S. citizenship.  By doing so, the Executive Director acted beyond his authority and contrary to longstanding Commission policy and precedent that documentary proof of citizenship was not "necessary for States to assess the eligibility" of a voter registration application submitted on the Federal Form.  As a result of the Executive Director's actions, and for the first time since Congress created the Federal Form, documentary proof of citizenship is now required to register to vote in *federal* elections in Alabama, Georgia, and Kansas.  The Executive Director immediately implemented these changes to the Federal Form on the EAC's website.

2.      The Executive Director's actions violated the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 500-596, 706, in at least *five* respects, any of which individually is

grounds for vacating the Executive Director's actions:  *First*, the Executive Director did not

obtain the approval of three Commissioners as required by the Help America Vote Act

("HAVA"), 52 U.S.C. § 20928, despite the presence of a full Commission quorum, rendering his

actions *ultra vires*.  *Second*, the Executive Director did not even have the authority under the

EAC's *own* internal policies and procedures to make policy decisions unilaterally, matters that

the Commission expressly reserved and committed exclusively to itself and to a full vote of the

Commissioners.  The Executive Director also violated EAC policy by engaging in prohibited *ex

parte* communications with officials from the States.  *Third*, the Executive Director did not

provide formal notice and opportunity to comment or present the States' requests to the

Commissioners for their consideration, the only avenues by which such a dramatic change in

Commission policy could have been made, because those are the administrative procedures that

the EAC utilized in establishing and enforcing its original policy.  *Fourth*, the Executive Director

did not explain the grounds for this dramatic change in EAC policy and precedent, a telling

omission because the NVRA permits the EAC to require only information that it concludes is

"necessary," and the EAC reaffirmed its conclusion that documentary proof was *unnecessary*

just two years ago in a well-reasoned 46-page opinion.  *Finally*, the Executive Director exceeded

the scope of the EAC's statutory authority, which precludes any documentary proof of U.S.

citizenship requirement absent a showing of necessity.  *See* A*rizona v. Inter Tribal Council of

Arizona, Inc.*, 133 S. Ct. 2247, 2259 (2013) ("*ITCA*").

        3.      The Executive Director's unlawful actions are the latest chapter in a

continuing and relentless campaign by certain states over the past decade to require that voter

registration applicants present documentary proof of U.S. citizenship when using the Federal

Form.  Beginning with Arizona in 2006, several states have requested—multiple times in some

cases, like Kansas and Arizona—that the EAC amend the Federal Form to require documentary proof of citizenship.  The EAC has repeatedly denied those requests.   Arizona's refusal to accept voter registration applications on the Federal Form without documentary proof culminated in the U.S. Supreme Court's decision in *ITCA*, 133 S. Ct. 2247, which held that States must "accept and use" the Federal Form as implemented by the EAC.   Arizona, Kansas and Georgia thereafter submitted new requests to require documentary proof of citizenship, which the EAC's prior Executive Director rejected in 2014, based on existing EAC policy, in a formal decision finding that documentary proof of citizenship requirements were inconsistent with the purposes of the NVRA, and were not shown to be necessary by any evidence provided by the States.  The U.S. Court of Appeals for the Tenth Circuit affirmed the prior Executive Director's decision and rejected Kansas and Arizona's subsequent APA challenge (Georgia did not challenge the EAC's decision). *See Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 2891 (2015).

4.      It is against the backdrop of this failed campaign by the States that Mr. Brian Newby assumed office as the EAC's Executive Director in November 2015.  Mr. Newby is a former Kansas election official appointed by the Kansas Secretary of State.  As a Kansas official, Mr. Newby publicly supported Kansas's efforts to achieve documentary proof of citizenship requirements.  Just two weeks after Newby was appointed as the EAC's Executive Director, Kansas submitted its *fifth* request to amend the Federal Form.  Tellingly, while Mr. Newby failed to provide formal public notice and an opportunity to comment before changing the EAC's policy, on information and belief, he entertained several *ex parte* communications from the Kansas Secretary of State, along with similar communications with officials from Alabama and Georgia, before he approved the States' requests.

5.      The timing of the Executive Director's decision jeopardizes the integrity of several upcoming federal elections.  Alabama's primary election will be held on March 1, 2016, with the deadline for registration on February 15, 2016.  Kansas's caucuses will be held on March 5, 2016, with registration available up to and including the day of the caucus for one of the two major political parties.  The Executive Director's decisions directly impact these upcoming elections.

6.      The Executive Director's decision will substantially burden the Plaintiffs' ability to conduct voter registration drives, and will deprive eligible voters of the right to vote in presidential primary elections.  Without the requested relief, the Executive Director's unlawful actions will cause substantial, immediate and irreparable harm to the Plaintiffs and voters in Alabama, Georgia and Kansas.  The Executive Director's unilateral modifications to the Federal Form, which are contrary to existing EAC policy should be immediately and permanently enjoined.

## PARTIES

7.      Plaintiff League of Women Voters of the United States (the "League") is a nonpartisan, community based organization headquartered in Washington, D.C.  Founded in 1920 as an outgrowth of the struggle to win voting rights for women, the League now has more than 150,000 members and supporters, and is organized in more than 750 communities and in every state.  As part of its mission, the League—with its state and local affiliates—operates one of the longest-running and largest nonpartisan voter registration efforts in the nation.  The League's mission mirrors the NVRA's stated goals of "increas[ing] the number of eligible citizens who register to vote in elections for Federal offices" and implementing procedures at all levels of government to "enhance[] the participation of eligible citizens as voters in elections for Federal office." 52 U.S.C. §  20505.  The League of Women Voters of the United States was a

4

party-intervenor in *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 289 (June 29, 2015).

8.      Plaintiff League of Women Voters of Alabama is a separately incorporated entity affiliated with the League of Women Voters of the United States.  Like the national League, the Alabama League is a nonpartisan, volunteer, community-based organization that, for many decades, has encouraged informed and active participation of citizens in government and worked to influence public policy through education and advocacy.  To advance its mission, the Alabama League leads voter registration drives, distributes information about the electoral process, and promotes electoral laws and practices that encourage voter participation. The organization is active throughout Alabama, with six local affiliates and more than 300 members.

9.      Plaintiff League of Women Voters of Georgia is a separately incorporated entity affiliated with the League of Women Voters of the United States.  Like the national League, the Georgia League is a nonpartisan, volunteer, community-based organization that, for over 90 years, has encouraged informed and active participation of citizens in government and worked to influence public policy through education and advocacy.  To advance its mission, the Georgia League leads voter registration drives, distributes information about the electoral process, and promotes electoral laws and practices that encourage voter participation.  The organization is active throughout Georgia, with six local affiliates and more than 500 members.

10.      Plaintiff League of Women Voters of Kansas is a separately incorporated entity affiliated with the League of Women Voters of the United States.  Like the national League, the Kansas League is a nonpartisan, volunteer, community-based organization that, for over 93 years, has encouraged informed and active participation of citizens in government and

worked to influence public policy through education and advocacy.  To advance its mission, the

Kansas League leads voter registration drives, distributes information about the electoral process,

and promotes electoral laws and practices that encourage voter participation.  The organization is

active throughout Kansas, with nine local affiliates and more than 750 members. The Kansas

League also was a party-intervenor in *Kobach*, 772 F.3d 1183.

   11. Plaintiff Project Vote is a national, nonpartisan, nonprofit corporation with

its principal office located in Washington, D.C. Project Vote's mission is   to build an electorate

that accurately represents the diversity of America's citizenry, and Project Vote fights to make

sure that every eligible citizen is able to register, vote, and cast a ballot that counts. Project Vote

is dedicated to conducting and facilitating voter registration drives in low-income communities,

communities of color, young Americans, and other underrepresented communities and

supporting the efforts of other organizations doing similar work.  Since 1994, Project Vote has

developed state-of-the-art voter registration programs and assisted millions of citizens

nationwide to register to vote, including through partnerships with state and local civic groups

that conduct voter registration drives. For example, in 2014, Project Vote engaged in civic

engagement programs with voter registration drives in a number of states, including Georgia.

Project Vote plans to conduct and facilitate voter registration activities in 2016, including

providing in-depth technical assistance to state-based groups including in Georgia. Project Vote

also provides resources and technical assistance to assist other organizations to conduct voter

registration drives, including state-specific resources for states such as Kansas, Alabama, and

Georgia.  Project Vote, Inc. was also a party-intervenor in in *Kobach*, 772 F.3d 1183.

   12. Plaintiff Georgia State Conference of the National Association for the

Advancement of Colored People ("Georgia NAACP") is a nonpartisan, interracial, nonprofit

membership-based advocacy organization with an unbroken presence in Georgia since 1917. The

Georgia NAACP maintains a network of branches throughout Georgia, from cities to small rural

counties.  Its mission is to eliminate racial discrimination through democratic processes and

ensure the equal political, educational, social, and economic rights of all persons, in particular

African-Americans. It is headquartered in Atlanta, includes 127 branches in most Georgia

counties, and currently has approximately 10,000 members. The Georgia NAACP's support of

voting rights has been central to its mission, and the Georgia NAACP has participated in

numerous lawsuits vindicating those rights. *See, e.g.*, *Ga. State Conf. of the NAACP v. Fayette

County Bd. Of Com'rs*, 2015 WL 4633575 (N.D. Ga. Aug. 3, 2015); *Ga. State Conf. of the

NAACP v. Kemp*, 841 F.Supp.2d 1320 (N.D. Ga. 2012). The Georgia NAACP also engages in

efforts to register African-American citizens to vote and to encourage African-American

registered voters to turn out to vote.

13.     Plaintiff Georgia Coalition for the People's Agenda ("GCPA") is a

Georgia nonprofit corporation with its principal place of business located in Atlanta, Georgia.

The GCPA is a coalition of more than 30 organizations, which collectively have more than 5,000

individual members. The organization encourages voter registration and participation,

particularly among minority and low-income citizens. The GCPA's support of voting rights is

central to its mission. The organization has committed, and continues to commit, time and

resources to conducting voter registration drives and GOTV efforts in Georgia. In 2014, for

example, the GCPA conducted training sessions on voter registration, voter education, voter ID,

Souls to the Polls, and other GOTV efforts in Georgia.

14.     Plaintiff Marvin Brown is a United States citizen and satisfies all of the

eligibility requirements for voting in Kansas.  Mr. Brown is 90 years old and a veteran who

served in World War II.  He is married to Plaintiff JoAnn Brown.  He was born in Arkansas, and, after World War II, moved to Kansas, where he lived and voted for approximately 30 years.  He and Mrs. Brown moved to back Arkansas in the late 1970s, but returned to Kansas in 2014 to be closer to their children, who live in Kansas City.  Shortly after returning to Kansas, Mr. Brown tried to register to vote, but received a letter indicating that he needed to provide documentary proof of citizenship in order to become registered.  He recently attempted to register again, this time using the Federal Form.  Upon information and belief, he has not been registered to vote by the State of Kansas solely because his Federal Form was not accompanied by documentary proof of citizenship.

15.     Plaintiff JoAnn Brown is a United States citizen and satisfies all of the eligibility requirements for voting in Kansas.  Mrs. Brown is 86 years old, and is married to Plaintiff Marvin Brown.  She and Mr. Brown moved to Arkansas in the late 1970s, but returned to Kansas in 2014 to be closer to their children, who live in Kansas City.  Mrs. Brown recently attempted to register to vote using the Federal Form.  Upon information and belief, she has not been registered to vote by the State of Kansas solely because her Federal Form was not accompanied by documentary proof of citizenship.

16.     Defendant Brian D. Newby is the Executive Director of the EAC, and is named as a party in his official capacity.

17.     Defendant United States Election Assistance Commission is an agency of the United States, 52 U.S.C. §§ 20921-30, 52 U.S.C. § 20508, and is an "agency" as that term is used in the APA, 5 U.S.C. § 551(1) and is named as a party due to the actions of the agency's Executive Director.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over this case pursuant to 28

U.S.C. §1331, because the case arises under federal law, *inter alia*, the Administrative Procedure

Act, 5 U.S.C. § 551 *et seq*., the National Voter Registration Act, 52 U.S.C. § 20501 *et seq*., and

the Help America Vote Act, 52 USCA § 20901 *et seq*.

19.     There exists an actual and justiciable controversy between Plaintiffs and

Defendants requiring resolution by this Court.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1)(C).

## FACTUAL AND LEGAL BACKGROUND

### A.     Origins of the Federal Form

21.     Congress enacted the National Voter Registration Act principally to

"increase the number of eligible citizens who register to vote in elections for Federal office."  52

U.S.C. § 20501(b)(1).  By providing for a single registration form that "[e]ach  State  shall accept

and use," *id.* § 20505(a)(1), Congress sought to ensure that states could not disenfranchise voters

by setting discriminatory or burdensome registration requirements.  *See ITCA*, 133 S. Ct. at

2255.  In passing the NVRA, Congress also recognized the need to protect the "integrity of the

electoral process." 52 U.S.C. § 20501(b)(3).  Both Houses of Congress debated and voted on the

specific question of whether to permit states to require documentary proof of citizenship in

connection with the Federal Form, striking a balance among the statute's purposes, and

ultimately rejected such a proposal.  *See* S. Rep. No. 103-6 (1993); 139 Cong. Rec. 5098 (1993);

H.R. Rep. No. 103-66, at 23 (1993) ("Conf. Rep."); 139 Cong. Rec. 9231-32 (1993).  In

particular, the final Conference Committee Report concluded that it was "not necessary or

consistent with the purposes of this Act" and "could be interpreted by States to permit

registration requirements that could effectively eliminate, or seriously interfere with, the [Act's] mail registration program." Conf. Rep. at 23-24 (1993).

22.     The NVRA directed the EAC to "develop" the Federal Form and "prescribe such regulations as are necessary to" do so.  52 U.S.C. § 20508(a)(1), (2).  The EAC's predecessor agency, the Federal Election Commission ("FEC"), [1] developed the initial Federal Form through an extensive notice and comment rulemaking process.  *See* 58 Fed. Reg. 51,132 (Sept. 30, 1993) (Advanced Notice of Proposed Rulemaking); 59 Fed. Reg. 11,211 (Mar. 10, 1994) (Notice of Proposed Rulemaking); 59 Fed. Reg. 32,311 (June 23, 1994) (Final Rules).  In doing so, the FEC made clear at the outset that "decisions may have to be made that information considered necessary by certain states may not be included on the [Federal Form]."  58 Fed. Reg. 51,132.  Specifically, the agency noted that some of the information required by states on their individual voter registration forms, "while undoubtedly helpful, might not be considered 'necessary' as the term is used in the NVRA."  *Id*. (emphasis added).

23.     The contents of the Federal Form are governed by these duly enacted regulations.[2]  Specifically, the contents of the Federal Form are governed by 11 C.F.R. § 9428.4(b)(1)-(3), which specifies the precise information that the Federal Form can request from an applicant.  With regard to citizenship, the regulations instruct that the Federal Form shall "list U.S. Citizenship as a universal eligibility requirement," "[c]ontain an attestation on the application that the applicant, to the best of his or her knowledge and belief, meets each of his or her state's specific eligibility requirements," and "[p]rovide a field on the application for the

---

[1]     When the NVRA was originally passed, the agency responsible for implementing the NVRA was the Federal Election Commission.  The Help America Vote Act of 2002 ("HAVA") later created the Election Assistance Commission and transferred to the EAC the responsibility of prescribing regulations necessary for a mail voter registration form for elections for Federal office. *See* 52 U.S.C. §§ 20508(a), 20921, 20929.

[2] The FEC and EAC entered into a joint rulemaking to transfer the NVRA regulations from the FEC to EAC on July 29, 2009.  74 Fed. Reg. 37,519 (July 29, 2009).  The transfer became effective on August 28, 2009.  *Id.* at 37,519.

signature of the applicant, under penalty of perjury, and the date of the applicant's signature."  11

C.F.R. § 9428.4(b)(1)-(3).[3]

24.    The FEC did not expressly address documentary proof of citizenship

during the course of the rulemaking; no state suggested that documentary proof might be

"necessary" under the NVRA. The agency determined however, addressing whether to require

information regarding naturalization, that "[t]he issue of U.S. citizenship is addressed within the

oath required by the Act and signed by the applicant under penalty of perjury.  To further

emphasize this prerequisite to the applicant, the words 'For U.S. Citizens Only' will appear in

prominent type on the front cover of the national mail voter registration form." 59 Fed. Reg. 32,

316 (June 23, 1994).

25.    The Federal Form is formatted as a postcard that the applicant can simply

fill out and mail in.  The Federal Form requires each applicant to check a box at the top of the

application indicating U.S. citizenship, and clearly directs "do not complete this form" if any

applicant checks "No" under citizenship.  The Federal Form further requires the applicant to sign

the bottom of the form and swear or affirm under penalty of perjury that he or she is a U.S.

citizen and further that, "[i]f I have provided false information, I may be fined, imprisoned, or (if

not a U.S. citizen) deported from or refused entry to the United States."  The cover of the Federal

Form pamphlet states "For U.S. Citizens" and the General Instructions begin with: "If you are a

U.S. citizen . . . ."  The General Instructions further explain: "All States require that you be a

United States citizen by birth or naturalization to register to vote in federal and State elections.

Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal,

State, or local election."   The Federal Form's application instructions open with: "Before filling

---

[3] The Help America Vote Act expressly dictated the additional requirement of a checkbox to indicate citizenship on the federal form, see below paragraph 25, 52 U.S.C. § 21083(b)(4)(A).

out the body of the form, please answer the questions on the top of the form as to whether you

are a United States citizen [and age 18].  If you answer no to either of these questions, you may

not use this form to register to vote." The Federal Form thus has a number of safeguards to

prevent non-citizen registration, including an attestation clause on the Federal Form that sets out

the requirements for voter eligibility, requiring registrants to sign the Federal Form under penalty

of perjury and imposing criminal penalties on persons who knowingly and willfully engage in

fraudulent registration practices.

26.     To ensure that applicants from each state "receiv[e] the  information

needed  to  correctly  complete  the [Federal Form] and attest their eligibility," 59 Fed. Reg.

32,317, the Form includes state-specific instructions as to each state's voter eligibility

requirements and instructions for filling out the fields on the form.  See 11 C.F.R. § 9428.6.

27.     Prior to the Executive Director's actions here, the Federal Form's state-

specific instructions also informed registrants: "To register in Kansas you must: be a citizen of

the United States"; to register in Alabama, "[y]our social security number is *requested* (by

authority of the Alabama Supreme Court, 17-4-122)," and "you must: be a citizen of the United

States . . ."; and "[t]o register in Georgia you must: be a citizen of the United States . . ."

(emphasis added).  Ex. 1.  The instructions did not mention documentary proof of citizenship or

any other document necessary for voter registration.

**B.     Prior State Attempts to Modify the Federal Form**

28.     Several states have sought to modify the Federal Form in the past decade;

the EAC has consistently and repeatedly rejected all such requests.  In 2004, Arizona voters

passed Proposition 200, which required local election officials to "reject any application for

[voter] registration that is not accompanied by satisfactory evidence of United States

citizenship."  Ariz. Rev. Stat. § 16-166(F).  Only particular forms of documentary proof of

citizenship, such as a "legible photocopy of the applicant's birth certificate," passport, or naturalization papers, qualify as "satisfactory evidence." *Id*.

29.     In 2006, Arizona requested that the EAC modify the state-specific instructions of the Federal Form to include Arizona's new documentary proof-of-citizenship requirement.  On March 6, 2006, after consideration by a quorum of Commissioners, the EAC denied Arizona's request.  In a letter sent by Executive Director Thomas Wilkey , the EAC explained that Arizona was obligated to "accept and use" the Federal Form and that the "EAC conclude[d] that" Arizona's application of its state requirement to Federal Form applicants "would effectively result in a refusal to accept and use the Federal Registration Form."  *See* Ex. 2.  On March 13, 2006, Arizona Secretary of State Jan Brewer wrote to the EAC requesting that the agency reconsider its decision, and indicating that, despite the EAC's decision, she planned to continue to instruct state election officials to apply a proof-of-citizenship requirement to the Federal Form.  *See* Ex. 3.  In July 2006, the Commission again considered the question and voted on whether to modify the Federal Form pursuant to Arizona's request.  The measure failed by a 2-2 Commission vote, having not received approval of three members of the EAC as required by law for the EAC to take any action.  *See* Ex. 4; 52 U.S.C. § 20928.  As Commissioner Ray Martinez III explained, the EAC had "established its own interpretive precedent regarding the use and acceptance of the Federal Form [and] upheld established precedent from [the FEC]."  *See* Ex. 5.  Under this precedent, the "'language of NVRA mandates that the Federal Form, without supplementation, be accepted and used by states to add an individual to its registration rolls.'"  *Id.* In his explanation, Commissioner Martinez further noted that the EAC had previously "chosen a consensus-driven" approach to similar activities, and had rejected a prior

form modification request from the state of Florida through a letter from the EAC General

Counsel "with the unanimous consent of the EAC Commissioners."  *Id.*

　　　30.　　Rather than challenge the EAC's rejection of its request under the

Administrative Procedure Act at the time, Arizona continued to require proof of citizenship from

Federal Form applicants, prompting the lawsuits that culminated in the Supreme Court's *ITCA*

decision. 133 S. Ct. 2247.  In *ITCA*, the Supreme Court held that Arizona's refusal to register

voters using the Federal Form unless accompanied by documentary proof of citizenship

conflicted with the Federal Form and that the NVRA therefore preempted Arizona's

documentary proof requirement.  The Supreme Court noted that the NVRA required the EAC to

include in the form "only such identifying information . . . as is *necessary* to enable the

appropriate State official to assess the eligibility of the applicant," 52 U.S.C. § 20508(b)(1)

(emphasis added).  The Supreme Court agreed that the NVRA requires all states to "accept and

use" the "Federal Form," which, as developed and approved by the EAC, does not require

documentary proof of citizenship.  As the Court explained, "[n]o matter what procedural hurdles

a State's own form imposes, the Federal Form guarantees that a simple means of registering to

vote in federal elections will be available." *ITCA*, 133 S. Ct. at 2255.   The Court further found

that the NVRA's "accept and use" requirement is a constitutional exercise of Congress' power

under the Elections Clause, and preempts state regulations governing the "Times, Places and

Manner" of holding federal elections.  *Id*. at 2253.  Accordingly, the only route for Arizona to

add a documentary proof-of-citizenship requirement to Federal Form applicants would have been

to challenge the EAC's denial of the request at that time or to again request that the EAC alter

the Federal Form and to "challenge the EAC's rejection of that request in a suit under the

Administrative Procedure Act."  *Id.* at 2259.

**C.     The EAC Once Again Rejects Arizona's and Kansas's Requests to Modify the Federal Form, Along with Georgia's**

31.     After the Supreme Court issued its *ITCA* decision, Arizona and Kansas[4] renewed their requests to the EAC to modify the Federal Form, as did Georgia.  The EAC initially deferred the request due to the lack of a Commission quorum, and Kansas and Arizona brought suit against the EAC.  The district court granted the motions to intervene in that action brought by the League, Project Vote, Inc., and others.  *See Kobach v. U.S. Election Assistance Comm'n*, No. 13-CV-4095-EFM-DJW, 2013 WL 6511874, at *5 (D. Kan. Dec. 12, 2013).  On January 17, 2014, in response to the district court's order remanding the matter to the EAC to issue a final decision, the EAC, acting through its then-Executive Director, Alice Miller, issued a thorough 46-page decision considering the extensive record submitted in response to its request for public comment and, based on that record, denying the requests of Arizona, Georgia and Kansas.  *See* Ex. 6.  Consistent with its previous determinations over two decades, the EAC found that the States had failed to demonstrate that documentary proof of citizenship was "necessary" within the meaning of the NVRA and the EAC's policy.  *Id.* at 45.

32.     As an initial matter, the EAC concluded that the Federal Form itself contains a number of self-regulating mechanisms to verify citizenship, including the attestation requirement and citizenship checkbox.  *Id.* at 13.  The oath required by the Federal Form must be signed under penalty of perjury and is similar to the one administered by courts to ensure truthfulness.  As the EAC noted, "[t]he overwhelming majority of jurisdictions in the United States have long relied on sworn statements similar to that included on the Federal Form to enforce their voter qualifications, and the EAC is aware of no evidence suggesting that this

---

[4]     Kansas enacted a law similar to Arizona's that directs election officials to reject voter registration applications that fail to provide satisfactory evidence of United States citizenship. Kan. Stat. Ann. § 25-2309(l).  Like Arizona's law, only particular forms of documentary proof of citizenship qualify as satisfactory evidence.  *Id.*

reliance has been misplaced." *Id.* at 29.  States may (and do) rely on criminal prosecutions and the deterrence generated thereby to enforce their citizenship requirements.  *See also* Kansas Public Comment to EAC, Jan. 2, 2014 (citing Arizona's admissions that criminal penalties deter non-citizen voter registration).  As the record before the EAC demonstrated, and as the states themselves previously acknowledged, these prosecutions have a particularly strong deterrent effect with respect to non-citizens because unlawful registration by a non-citizen can lead to hefty fines, imprisonment, deportation, and/or subsequent inadmissibility to the United States. *See also* 8 U.S.C. §§ 1227(a), 1182(a).  In short, as the EAC concluded, "the evidence in the record is insufficient to support the States' contention that a sworn statement is 'virtually meaningless' and not an effective means of preventing voter registration fraud."  Ex. 6 at 31.

33.     Furthermore, the EAC concluded that the states have the "ability to identify potential non-citizens and thereby enforce their voter qualifications relating to citizenship, even in the absence of the additional instructions." *Id.* at 33.  For instance, as the EAC noted, the states are required under HAVA to coordinate with the states' driver licensing agencies and the Social Security Administration to share information relevant to voter registration. *See* 52 U.S.C. § 21083(a)(5).  Kansas itself has demonstrated that it is able to identify potential non-citizens who are registered to vote by reviewing records of those who hold special driver's licenses issued only to noncitizens.  The EAC also noted that the states may use information provided by potential jurors seeking excusal from jury duty to assess citizenship. Although jurors' excuses are not a perfect form of citizenship verification, the records of state jury commissioners are a useful tool for the States to enforce their voter registration laws without burdening legitimate registrants.  The EAC also pointed to two different databases—the federal "SAVE" database and the multistate "EVVE" database—that the states can use and are already

using to verify citizenship status.  The EAC concluded these avenues for citizenship verification

are more than sufficient to meet the States' needs and make documentary proof unnecessary.

34.     Kansas and Arizona challenged the EAC's action under the APA; Georgia

declined to do so. Ultimately the U.S. Court of Appeals for the Tenth Circuit sustained the

EAC's decision, and Kansas and Arizona were not permitted to amend the Federal Form.  *See*

*Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183 (10th Cir. 2014), *cert. denied*, 135

S. Ct. 289 (June 29, 2015).  As the Tenth Circuit noted, "permitting such state alterations

threaten[s] to eviscerate the [Federal] Form's purpose of 'increasing the number of eligible

citizens who register to vote.'"  *Id.* (quoting *ITCA*, 133 S. Ct. at 2256).  Unless the EAC finds

that the information is "necessary to enforce" the States' voter qualifications, the Federal Form

must remain free of the State's "procedural hurdles," as Congress intended.  *ITCA*, 133 S. Ct. at

2255, 2259.

### D.     Authority of the EAC Executive Director

35.     Although the EAC lacked a quorum of Commissioners at the time of the

EAC decision, the Tenth Circuit concluded that under a prior delegation of authority by the

Commission when a quorum existed (which has been subsequently superseded, *see infra*), the

Executive Director had authority to reject Kansas's and Arizona's requests because they were

inconsistent with the EAC's policies and then-existing procedures.  *See Kobach*, 772 F.3d at

1193-94.

36.     In rejecting requests from Arizona, Georgia and Kansas to modify the

Federal Form, EAC Executive Director Alice Miller was acting under two sources of authority:

(1) prior EAC policy established through notice and comment rulemaking, and consistently

maintained by votes of at least three Commissioners operating with a full quorum, and (2) an

express delegation of authority from the Commissioners to apply agency policy and "maintain the [Federal Form]."

37.     While HAVA provides that any action which the EAC is authorized to take "may be carried out only with the approval of at least three of its members," a "limited subdelegation of decisionmaking authority" may be granted to EAC staff with formal approval of three or more Commissioners. 52 U.S.C. § 20928; *Kobach*, 772 F.3d at 1191.

38.     In its "Role and Responsibilities Statement," dated September 15, 2008, a quorum of EAC Commissioners validly delegated certain authority to the Executive Director, including the responsibility to "[i]mplement and interpret [policies, regulations, and guidance] issued by the commissioners," and to "[m]anage the daily operations of EAC consistent with Federal statutes, regulations and EAC policies." The Statement also charged the Executive Director with authority to "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies." However, as the Tenth Circuit noted, "the 2008 subdelegation did not transfer the Commission's full power," but rather limited the Executive Director's authority to "maintaining the Federal Form *consistent with the Commissioners' past directives* unless and until those directions were countermanded." *Kobach*, 772 F.3d at 1193-94 (emphasis added).

39.     Additionally, the Executive Director is prohibited from engaging in certain *ex parte* communications, as outlined in the EAC's 2006 "Ex Parte Communications Policy." *See* Election Assistance Commission, "EAC Ex Parte Communications Policy," *available at* http://www.eac.gov/assets/1/Documents/Statement%20on%20EAC%20Ex%20Parte%20Communications%20Policy%20may%2025%202006.pdf (accessed Feb. 5, 2016). That policy specifies that "[n]o Commissioner or staff member with decision making authority shall communicate ex

parte with any prohibited individual regarding a particular matter before the Commission." *Ex parte* communications are defined as "off the record and nonpublic communications" while "prohibited individuals" include "any individual representing an entity or industry which is regulated" by the EAC. "Particular matters" are "matters over which EAC has decision making authority."

### E.  The EAC's Quorum is Restored

40.     In 2014, the U.S. Senate confirmed three presidentially-appointed Commissioners to the EAC, including two Republicans and one Democrat. Among the EAC's first official actions was to clarify and further restrict the Commission's previously delegated authority to the Executive Director through a new "Election Assistance Commission Organizational Management Policy Statement," which became effective February 24, 2015 ("2015 Policy Statement").  *See* Election Assistance Commission, "Organizational Management Policy Statement," *available at* http://www.eac.gov/assets/1/Documents/Organizational%20Management%20Policy%20Stateme nt%20(final%20adopted%202-24-15-cm).pdf (accessed Feb. 5, 2016).   Among other things, the 2015 Policy Statement confirmed that

> Any action of the Commission authorized by HAVA requires
> approval of at least three of its members.  42 U.S.C. § 15328.
>
> . . . .
>
> **II.  Division of authority regarding policymaking and day-to-
> day operations**
>
> 1.  **The Commissioners shall make and take action in areas of
> policy**.  Policymaking is a determination setting an overall agency
> mission, goals and objectives, or *otherwise setting rules, guidance
> or guidelines*.  Policymakers set organizational purpose and
> structure, or the ends the agency seeks to achieve.  *The EAC makes
> policy through the formal voting process*.

2.  **The Executive Director in consultation with the Commissioners is expected to:**  (1) *prepare policy recommendations* for commissioner approval, (2) implement policies *once made*, and (3) take responsibility for administrative matters.  The Executive Director may carry out these responsibilities by delegating matters to staff.

*Id.* at 2 (emphasis added).  The 2015 Policy Statement expressly superseded the Commission's earlier delegations of authority to the Executive Director, including the 2008 "Roles and Responsibilities Statement," *see id*. at 1 (providing that the 2015 Policy Statement supersedes 2008-2012 statements and "replaces any existing EAC policy or document that is inconsistent with its provisions").  The 2015 Statement makes no reference to the Federal Form as being within the authority of EAC Executive Director.

### F.      Brian Newby is Appointed as Executive Director of the EAC

41.     On November 2, 2015, the Commission appointed Brian Newby to serve as Executive Director.  For the 11 years prior to his appointment, Mr. Newby acted as an election official in the state of Kansas. As the Election Commissioner of Johnson County, the largest county in Kansas, Mr. Newby worked under the Kansas Secretary of State making the request at issue here, and has been involved in Kansas's continuous efforts to compel burdensome proof of citizenship requirements as a barrier to voter registration, including testifying in favor of implementation of the requirement and publicly commenting on his actions to help enforce the law on many occasions.  *See* Ex. 7.

42.     On January 3, 2014, Newby submitted comments to the EAC in support of granting Kansas's August 9, 2012 request to require documentary proof of citizenship with the Federal Form.  Writing to the EAC, Newby "respectfully request[ed] that the voter registration form maintained for Kansans by the Election Assistance Commission (EAC) be modified to the full extent previously requested by the Kansas Secretary of State."  Ex. 8.

43.     Under the Secretary of State's leadership, tens of thousands of voter registration applications in Kansas have been held on a "suspense list" as incomplete because of their supposed failure to provide documentary proof of citizenship. In January 2014, only a year after the requirement was first enforced, that list contained over 20,000 names. Kansas then reduced the list after using birth certificate records to verify the citizenship and Kansas birth of nearly half of the voters with suspended applications. By October of 2014, the number of people on the suspense list exceeded 27,000. By August 2015, it exceeded 35,000.

44.     As of February 2016, after Kansas implemented a new policy of removing names from the suspense list whose applications have been incomplete for over 90 days, the suspense list contains more than 10,500 names.

### G.     The Executive Director Unilaterally Grants Requests by Alabama, Georgia and Kansas to Require Documentary Proof of Citizenship

45.     On or about November 17, 2015, just fifteen days after Mr. Newby's appointment as Executive Director, Kansas submitted its *fifth* request to the EAC to require documentary proof of citizenship.  *See* Ex. 9.   Kansas referenced its statutory requirement of documentary proof of citizenship to register to vote, and purported to include new evidence showing noncitizens registering or voting. In fact, the evidence was of the same type already reviewed by the EAC in its January 17, 2014 decision, and included individual cases of alleged non-citizen registration that had already been submitted to the EAC. Kansas also cited its adoption of Kansas Administrative Regulation 7-23-15, which purported to interpret the state's new election code by adding a 90-day requirement to provide proof of citizenship after registering, but as far as relates to Federal Form applicants, added no new substance.

46.     On November 19, 2015, two days after receiving Kansas's request, Mr.

Newby wrote to Kansas stating that "this office" was "currently reviewing" the state's request.

*See* Ex. 10.

47.     On December 21, 2015, Counsel for the League submitted a letter to Mr.

Newby in response to Kansas's latest request.  The letter reminded the EAC that it could

implement new modifications to the Federal Form only through notice-and-comment

rulemaking, that modifying the Federal Form as requested by Kansas would constitute an official

EAC action requiring a vote of at least three Commissioners, and that modifying the Federal

Form to allow documentary proof of citizenship would violate the NVRA, as previously affirmed

by the EAC and the Tenth Circuit.  *See* Ex. 11.  Mr. Newby confirmed receipt of this letter on

January 23, 2016, thirty-two days after the League's letter was submitted.

48.     On December 24, 2015, Counsel for Project Vote submitted a letter to Mr.

Newby in response to Kansas's latest request, noting that the specific issue had been considered

and denied following a notice-and-comment procedure in 2014, and that any modification to the

Federal Form would require a notice-and-comment rulemaking procedure because it would

require a revision to relevant federal regulations and would reverse a substantive position of the

EAC, and that granting Kansas' request would be arbitrary and capricious and contrary to law.

*See Ex.* 12.  Mr. Newby confirmed receipt of this letter on January 23, 2016, twenty-nine days

after Project Vote's letter was submitted.

49.     On January 21, 2016, the Kansas Secretary of State appeared before a

Kansas Senate Committee and addressed the status of the state's renewed request to the EAC. On

information and belief, the Secretary of State twice assured committee members that the Federal

Form would be changed before the next election—though the EAC had not yet publicly taken

action on Kansas's request.  *See* Zachary Roth, *Federal agency helps red states make voter registration harder*, MSNBC.com, Feb. 4, 2016, http://www.msnbc.com/msnbc/federal-agency-helps-red-states-make-voter-registration-harder.

50.     The EAC did not issue any notice seeking public comment on Kansas's renewed request.

51.     The Commission did not consider and did not vote on Kansas's renewed request.

52.     Three Commissioners did not approve Kansas's renewed request.

53.     Notwithstanding the absence of any notice and comment period, and notwithstanding the absence of a vote of three Commissioners, the Executive Director granted Kansas's request and immediately changed the Federal Form on the EAC website with instructions informing Kansas voter registration applicants that they must submit a "document [specified therein] demonstrating United States citizenship within 90 days of filing the application . . ."  *See* Exs. 13 & 14.

54.     Mr. Newby did not stop there.  Alabama and Georgia previously had requested that the EAC amend the Federal Form to require voter registrations in those states to supply documentary proof of citizenship.  Alabama's request was made on December 18, 2014, and Georgia's request was submitted on August 1, 2013. *See* Exs. 15 & 16.  (In his January 29, 2016 letter to Alabama, Newby refers to a follow-up request, purportedly submitted by Alabama to the EAC on February 19, 2015, but no such letter appears on the EAC website.)

55.     The EAC had already denied Georgia's request on January 17, 2014, following the notice and comment period during which the Arizona and Kansas requests were considered.

56.     Unlike Arizona and Kansas, Georgia did not challenge the EAC's denial of its request.

57.     The EAC did not issue any notice seeking public comment on Alabama's request. The EAC did not issue any new notice seeking public comment on Georgia's request following the EAC's denial of that request on January 17, 2014.The Commission did not consider and did not vote on Alabama's or Georgia's requests.

58.     Three Commissioners did not approve Alabama's or Georgia's requests.

59.     Notwithstanding the absence of any notice and comment period following the denial of Georgia's 2013 request, and the absence of any notice and comment period regarding Alabama's request, and notwithstanding the absence of a vote of three Commissioners, the Executive Director granted Alabama's and Georgia's requests and immediately changed the Federal Form on the EAC website to require Alabama and Georgia voter registration applicants that they must submit documentary proof of citizenship with their voter registration applications on the Federal Form. *See* Exs. 17 & 18.

60.     The state-specific instructions on the newly-changed Federal Form now require Alabama and Georgia voters to supply "satisfactory evidence of U.S. citizenship." *See* Ex. 14.

61.     The Executive Director provided no written explanation for these decisions, nor did he state that the EAC had made any conclusion regarding the consistency of the changes with federal law.

62.     In an interview with a media organization that is not part of the administrative record, the Executive Director took the position that he had the authority to unilaterally alter the instructions to the Federal Form, and further stated that he was in fact

*required* to change the instructions in response to any state's request.  *See* Zachary Roth, *Federal agency helps red states make voter registration harder*, MSNBC.com, Feb. 4, 2016, http://www.msnbc.com/msnbc/federal-agency-helps-red-states-make-voter-registration-harder. Mr. Newby's post-regulatory action rationale is not only irrelevant, it flies in the face of the Tenth Circuit's express holding "that the EAC is *not* compulsorily mandated to approve state-requested changes to the Federal Form." *Kobach*, 772 F.3d at 1194 (emphasis added).

63.     In that same interview, the Executive Director also admitted that he had communicated with election officials in Alabama and Kansas, including Kansas's Secretary of State, regarding changes pertaining to documentary proof of citizenship requirements prior to making a final decision. Commissioners were not included in those discussions because, according to Mr. Newby, "[i]t wouldn't have been proper."

64.     The Executive Director did not make, and did not have the authority to make, the statutorily-required finding that the requested changes were "necessary" for the States to enforce their voter qualifications.

65.     No significant facts or circumstances have changed since the EAC's 2014 decision rejecting requests from Arizona, Georgia and Kansas to modify the Federal Form by requiring documentary proof of citizenship.

66.     The Executive Director's modifications to the Federal Form requiring Alabama, Georgia and Kansas voters to supply documentary proof of citizenship in connection with voter registration constitute "final agency action" within the meaning of 5 U.S.C. § 704. Legal consequences directly flow from the Executive Director's decisions, because voter registrants in Alabama, Georgia and Kansas are now being informed that they cannot register to vote in federal elections using the Federal Form without first supplying documentary proof of

citizenship.  Indeed, on February 5, 2016, Alabama signaled that it will promptly begin requiring

documentary proof of citizenship from new voting registrants using the Federal Form, stating

that its "Office of the Secretary of State will begin working towards implementation now that we

have received permission from the Election Assistance Commission[.]"  *Alabama Secretary of*

*State Releases Statement Regarding Voting Citizenship*, Feb. 6, 2016, *available at*

http://www.sos.alabama.gov/PR/PR.aspx?ID=10291.  That is a substantial change in the law

because, previously, voter registrants in those states were permitted to register to vote in federal

elections using the Federal Form without supplying such evidence.

### H.    The EAC's Action Will Cause Immediate and Irreparable Harm

67.    Requiring documentary evidence of citizenship pursuant to the EAC

Executive Director's recent actions substantially and illegally burdens the rights of voter

registrants in violation of the NVRA, the APA, and the Commission's regulations, and hinders

the ability of the Plaintiffs to carry out their mission of promoting voter participation through

voter registration drives.  It also forces Plaintiffs in all affected jurisdictions to expend

substantial resources to educate the public about the new requirements, when Plaintiffs have

already, in the current election cycle, spent significant time and money to educate voters about

existing voter registration rules that now could be changed mere weeks or months before the

election.  Further, it requires Plaintiffs to divert resources previously used to help voters register

to instead assist eligible applicants in securing proper proof-of-citizenship documents in order to

exercise their right to vote. The Plaintiffs have already been required to expend and divert

resources in this manner where such requirements have been in effect for registrants who use a

state voter registration form, including Kansas. If the Executive Director's decision is allowed to

stand, the high costs of educating voters about these new requirements would have a significant

detrimental impact on all of Plaintiffs' other activities.

68.     Moreover, Plaintiffs concentrate their voter registration drives at locations that reach large numbers of unregistered voters, such as high schools, community colleges, sporting events, and naturalization ceremonies.  Many otherwise eligible voters would not have the required documents while at these locations or during these times, and may not otherwise register to vote. Other potential voters, including individual members of Plaintiffs' organizations, who do not currently possess qualifying documents would be faced with the costs and burdens of securing such evidence or risk being denied their right to vote in federal elections altogether. Many voters will face confusion and uncertainty over whether they are eligible to register in light of the close proximity of the Executive Director's decision to upcoming primary elections in these States, chilling voter participation and causing Plaintiffs increased costs in voter education and outreach. The modification to the Federal Form's state-specific instructions would thus impede the Plaintiffs' mission of promoting full civic participation in elections, and would impose concrete financial and other costs on the Plaintiffs' organizations and their members in carrying out that mission.  This poses imminent harm to Plaintiffs' voter registration efforts, and to new voters who will be unable to provide the requested documentation.

69.     Requiring documentary evidence of citizenship substantially and illegally burdens the rights of voter registrants in violation of the NVRA and the Commission's regulations, and hinders the ability of Plaintiffs to assist voters to register, in particular, eligible citizens who do not have proof of citizenship and therefore cannot register to vote or cast ballots that count under the new scheme. Plaintiffs generally conduct and facilitate site-based community voter registration drives, such as at shopping malls and bus stops. Many otherwise eligible voters would not have the required documents while at these locations and may not otherwise register to vote. Plaintiffs will also have to revise procedures and educational materials

to inform community voter registration drives and members of the public regarding the new procedures and the means by which eligible citizens without proof of citizenship may become registered to vote.  The EAC's modification to the state-specific instructions would thus harm Plaintiffs' missions to ensure that all eligible voters can register and cast a ballot that counts.

## COUNT I

### (Administrative Procedure Act – Exceeds Statutory Authority)

70.     Paragraphs 1-69 are incorporated herein by reference.

71.     Section 208 of HAVA requires that "[a]ny action which the Commission is authorized to carry out under this Act may be carried out only with the approval of at least three of its members."

72.     Only the Commission had the power and authority to consider the requests by Alabama, Georgia and Kansas to require documentary proof of citizenship in connection with the Federal Form.

73.     By approving the requests by Alabama, Georgia and Kansas to amend the Federal Form and require documentary proof of citizenship without first obtaining the approval of three Commissioners, the Executive Director exceeded the scope of the Executive Director's and the EAC's authority.

74.     The Executive Director's decision is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

## COUNT II

### (Administrative Procedure Act – Exceeds Delegated Authority)

75.     Paragraphs 1-74 are incorporated herein by reference.

76.     Through its 2015 Policy Statement, the EAC has expressly limited the Executive Director's authority to three specific tasks: the "prepar[ation] of policy

28

recommendations for commissioner approval"; the "implement[ation] [of] policies once made"; and "responsibility for administrative matters."

77.     While the 2015 Policy Statement narrowed the Executive Director's responsibilities, the Commissioners' duties were broadened. Specifically, the Commissioners have responsibility for "mak[ing] and tak[ing] action in areas of policy." The Statement specifies that "[p]olicymaking is a determination setting an overall agency mission, goals and objectives, or otherwise setting rules, guidance or guidelines" and that "[t]he EAC makes policy through the formal voting process."  The Executive Director's action constitutes a concrete change in agency policy, enacted without the approval of three Commissioners, and was not a mere administrative matter.

78.     By granting the states' requests, and effecting a reversal of EAC policy, the Executive Director violated the EAC's internal policies and procedures, and exceeded the authority delegated to him by a quorum of Commissioners in the EAC's 2015 Policy Statement.

79.     Additionally, the EAC's Ex Parte Communications Policy prohibits EAC staff members with decisionmaking authority from engaging in off the record or nonpublic communications with individuals representing entities regulated by the EAC regarding a matter over which the EAC has decisonmaking authority.

80.     The Executive Director admitted to communicating with election officials from the States making these requests regarding amending state-specific instructions to the Federal Form prior to issuing the determination letters on January 29, 2016.

81.     Because the communications were off the record and nonpublic, with individuals representing entities regulated by the EAC, and regarding particular matters before the Commission, they violated the EAC's Ex Parte Communications Policy.

29

82.     The Executive Director's violations of the EAC's internal policies were arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

**COUNT III**

**(Administrative Procedure Act – Failure to Provide Adequate Notice and Comment)**

83.     Paragraphs 1-82 are incorporated herein by reference.

84.     The Executive Director changed the EAC's longstanding policy and legal determination that documentary proof of citizenship was not "necessary" within the meaning of the NVRA, without providing interested parties the "fair notice" required by the APA, despite receiving notification by the League and Project Vote that such a change required notice-and-comment rulemaking and approval by the Commission.

85.     The Executive Director never published any formal notice that he was actively considering changing the EAC's policy with respect to documentary proof of citizenship, prior to granting the requests of Alabama, Georgia and Kansas, let alone the grounds, if any, upon which the States purported to seek reconsideration of the EAC's policy.

86.     The Executive Director's decision violated the notice and comment requirements of the APA and is therefore arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

**COUNT IV**

**(Administrative Procedure Act – Arbitrary and Capricious Action)**

87.     Paragraphs 1-86 are incorporated herein by reference.

88.     The EAC's longstanding policy and legal determination that documentary proof of citizenship was not "necessary" within the meaning of the NVRA was based on evidentiary findings by Congress and the EAC and sounds considerations of policy.

89.     The Executive Director did not explain the basis for the change in the EAC's policy, such as changed circumstances or new evidence.

90.     Executive agencies are required to explain the bases for their decisions, especially when they change longstanding rules, regulations and policies, and statutory interpretations.

91.     The Executive Director's failure to explain the grounds for his decision was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

## COUNT V

**(Administrative Procedure Act – Violation of the National Voter Registration Act)**

92.     Paragraphs 1-91 are incorporated herein by reference.

93.     The NVRA specifies the necessary content of the Federal Form.

94.     The NVRA does not require voter registration applicants using the Federal Form to provide documentary proof of citizenship.

95.     By requiring voter registration applicants in Alabama, Georgia and Kansas to supply documentary proof of citizenship without determining that such a requirement is "necessary" to determine voter eligibility, the EAC violated the NVRA.

96.     The EAC's violation of the NVRA was arbitrary, capricious, an abuse of discretion, and not in accordance with law under the APA.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs request that the Court issue judgment in their favor and against Defendants and award the following relief:

a.     A temporary restraining order and preliminary injunction voiding the Executive Director's amendments to the Federal Form;

31

    b.  Vacatur of the letters the Executive Director transmitted to Alabama, Georgia and Kansas permitting them to require documentary proof of citizenship in connection with the Federal Form.

    c.  An award to Plaintiffs for costs and disbursements incurred in connection with this action, including, without limitation, their reasonable attorneys' fees, expenses, and costs pursuant to statute.

    d.  An award of such other relief as the Court may deem just and proper.

    Respectfully submitted,

    /s/ Amelia J. Schmidt

    _____

    Amelia J. Schmidt
     D.C. Bar No. 1012380
    STROOCK & STROOCK & LAVAN LLP
    1875 K Street NW
    Washington, DC 20006
    (202) 739-2800
    aschmidt@stroock.com

      **-** and –

    Michael C. Keats*
    Joel T. Dodge*
    STROOCK & STROOCK & LAVAN LLP
    180 Maiden Lane
    New York, New York 10038
    (212) 806-5400
    mkeats@stroock.com

    Wendy R. Weiser*
    Jonathan Brater*
    Tomas Lopez*
    Robert Ferguson*
    BRENNAN CENTER FOR JUSTICE
    161 Avenue of the Americas, 12th Floor
    New York, New York 10013
    (646) 292-8310
    wendy.weiser@nyu.edu

Susan M. Davies
    D.D.C. Bar No. 54867
Jonathan D. Janow
    D.C. Bar No. D00333
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW, Suite 1200
Washington, DC  20005
(202) 879-5000
susan.davies@kirkland.com

*Attorneys for Plaintiffs the League of Women Voters of the United States, the League of Women Voters of Kansas, the League of Women Voters of Alabama, and the League of Women Voters of Georgia*

Jon M. Greenbaum
    D.C. Bar No. 489887
Ezra D. Rosenberg
    D.C. Bar No. 489887
LAWYERS' COMMITTEE FOR
    CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

Linda Stein
    D.C. Bar No. 376217
Errol R. Patterson
    D.C. Bar No. 379715
Jason Abel
    D.C. Bar No. 490382
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-3000
lstein@steptoe.com

*Attorneys for Plaintiffs the Georgia State Conference of the NAACP, and Georgia Coalition for the People's Agenda*

Dale E. Ho
   D.D.C. Bar No. NY0142
Orion Danjuma*
AMERICAN CIVIL LIBERTIES
   UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
dale.ho@aclu.org

Doug Bonney*
ACLU FOUNDATION OF KANSAS
6701 W. 64th Street, Ste. 210
Overland Park, KS 66202
(913) 490-4102
dbonney@aclukansas.org

*Attorneys for Plaintiffs Marvin Brown and JoAnn Brown*

John A. Freedman
   D.C. Bar. No. 453075
ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, DC  20001
(202) 942-5000
John.Freedman@aporter.com

Michelle Kanter Cohen
   D.C. Bar No. 989164
PROJECT VOTE
1420 K Street, Suite 700
Washington, DC 20005
(202) 546-4173
mkantercohen@projectvote.org

*Attorneys for Plaintiff Project Vote*

*\*Pro hac vice motion pending*

February 12, 2016