IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, LEAGUE OF WOMEN VOTERS OF ALABAMA, LEAGUE OF WOMEN VOTERS OF GEORGIA, LEAGUE OF WOMEN VOTERS OF KANSAS, GEORGIA STATE CONFERENCE OF THE NAACP, GEORGIA COALITION FOR THE PEOPLE'S AGENDA, MARVIN BROWN, JOANN BROWN, and PROJECT VOTE<br><br>       Plaintiffs,<br><br> v.<br><br>BRIAN D. NEWBY, in his capacity as the Executive Director of The United States Election Assistance Commission; and<br><br>THE UNITED STATES ELECTION ASSISTANCE COMMISSION<br><br>       Defendants.<br><br>KANSAS SECRETARY OF STATE KRIS W. KOBACH and PUBLIC INTEREST LEGAL FOUNDATION<br><br>       Defendant-Intervenors. | Case No. 16-cv-236 (RJL) |

**PLAINTIFFS' ADDITIONAL SUPPLEMENTAL MEMORANDUM IN SUPPORT OF
PRELIMINARY INJUNCTION**

**PRELIMINARY STATEMENT**

Neither the Federal Defendants nor the Intervenor Defendants seriously defended the Executive Director's unilateral actions at oral argument or in their papers. HAVA plainly requires the affirmative approval of three EAC Commissioners to act on the States' requests to require documentary proof of citizenship with the Federal Form, and it is undisputed that the Executive Director did not obtain the approval of three Commissioners. The EAC's "2015 Management Statement" also plainly does not authorize the Executive Director to reverse two decades of consistent Commission policy and precedent against requiring documentary proof of citizenship with the Federal Form. The Defendants did not—because they could not—quote a single word of any Commission document or decision reflecting any such delegation. Simply put, the record is clear that the Executive Director acted without authority under HAVA and the EAC's own procedures, and thus that the Executive Director's unilateral approval of the States' requests was *ultra vires*.

Faced with Plaintiffs' clear likelihood of success on the merits, Kansas is left to argue that Plaintiffs cannot establish that they are being irreparably harmed. Kansas even goes so far as to suggest that Plaintiffs lack standing to pursue their claims. The Secretary knows better: Kansas fully litigated the issue of whether documentary proof may be required with the Federal Form against most of the Plaintiff Organizations in *Kobach v. EAC*, and several Plaintiffs and other voter groups were plaintiffs in the earlier *ITCA* litigation on the same topic.

More fundamentally, courts around the country have routinely held that voter registration organizations generally—and Plaintiffs in particular—are irreparably harmed where government actions thwart and chill their efforts to pursue their missions of promoting citizen participation in the electoral process by conducting voter registration drives. Every day that Mr. Newby's unlawful action stands, Plaintiffs are forced to divert resources toward addressing burdensome

-1-

and unlawful proof of citizenship requirements in Kansas, and toward correcting voter confusion over Alabama and Georgia's current limbo where proof of citizenship requirements are listed on the Federal Form but not enforced.  The record evidence amply demonstrates that all three States' documentary proof of citizenship requirements significantly interfere with Plaintiffs' voter registration efforts, which the Federal Form was designed to avoid.  Therefore, Plaintiffs *have* suffered clear irreparable harm and will continue to suffer such harm until the Executive Director's *fait accompli* is reversed.  Moreover, as this Court recognized, there is no guarantee that this case will be resolved before Kansas's August primary elections, making a preliminary injunction necessary to stem Plaintiffs' harm in the interim.

Finally, recognizing that the Executive Director's private memorandum lacks any defensible rationale for changing the EAC's longstanding policy against documentary proof of citizenship, the Secretary asserts that the Court should just remand this case to the Executive Director for a more detailed explanation.  However, remand to the Executive Director would be an empty act, because Mr. Newby lacked the authority to take action on this matter in the first instance without the approval of three Commissioners.  While the Executive Director is free under the EAC's 2015 Management Statement to *recommend* to the Commissioners that they consider changing the EAC's longstanding policy against documentary proof of citizenship, the Executive Director cannot decide the question for the Commissioners.  Although the Secretary would like to cast any such remand to the Commission as an appeal from the Executive Director's decision, that would accord legal effect to the Executive Director's actions that they cannot have.  The Secretary cannot bypass the Congressionally-mandated bipartisanship of the EAC under the guise of a remand that would allow a partisan official from one political party, who was neither appointed by the President nor confirmed by Congress, to act on behalf of the

Commissioners with the approval of Commissioners of only that official's own political party.

Plaintiffs respectfully submit that the proper relief is for the Executive Director's *ultra vires* actions to simply be vacated.

## I.      Plaintiffs Have Demonstrated Irreparable Harm

*A.      Plaintiffs are Irreparably Harmed by the Executive Director's Decision*

Plaintiffs have produced substantial evidence demonstrating that the Executive Director's actions have interfered with their ability to conduct voter registration drives, and have forced them to reallocate scarce organizational resources toward practices that are less efficient for voter registration:

<u>First</u>, the Executive Director's actions have already impaired the rights of voters in Kansas, including Plaintiffs' members and those they seek to register, and will soon do the same in Alabama and Georgia. For voters like Robert Gann of Kansas, the right to vote in the coming federal election will now depend on their ability to afford the cost of obtaining documentation proving that they are lawful citizens. *See* Krehbiel Decl. ¶ 6 (Dkt. #47-5). For others like Mary Curtiss McCrea, it will depend on their persistence to endure bureaucratic hurdles—which the Secretary himself conceded at oral argument should be deemed illegal even in Kansas—and unnecessary expense in order to prove that they are who they say they are. *See id.* ¶¶ 7-9. The Secretary's attempts to minimize the obstacles posed by documentary proof of citizenship have not prevented mass disenfranchisement in Kansas. According to a document given to the Kansas League by the Secretary's office, as of March 14, the state lists over 17,000 individuals whose registrations could not be completed, many of whom cannot now complete registration for federal elections using the Federal Form without providing documentary proof of citizenship. Kansas's claim that these individuals could submit documents up to August 1 is false; they must provide documentary proof within 90 days or the state will purge their names from its list.

-3-

*Second*, the Executive Director's actions have substantially interfered with Plaintiffs' voter registration efforts, despite their best efforts to comply with the new burdens.[1] Plaintiffs' organizational missions are to increase participation by helping voters register, and they relied on the Federal Form as a backstop in light of state laws making the registration process unduly complex and burdensome. *See* Furtado Decl. ¶ 29 (Dkt. #13-7). Similarly, although Project Vote seeks to help voters register in all elections, Project Vote recommends that Federal Forms be made available if that is the only way a citizen can become registered. *See* Slater Decl. ¶ 23 (Dkt. #13-9). Before the Executive Director's unlawful decision, Plaintiffs could hold registration drives and fairs in Kansas, and if a registrant did not have proof-of-citizenship documentation readily available, they could still register for federal elections with the Federal Form. Because of the Executive Director's actions, that Congressionally-mandated option is lost,[2] and Plaintiffs essentially can only effectively conduct voter registration door-to-door where potential voters are more likely to have proof-of-citizenship. *See id.* ¶¶ 31-37.

Requiring documentary proof of citizenship with the Federal Form has made it difficult or impossible for Plaintiffs to conduct effective registration drives in Kansas, and, when drives

---

[1] The Secretary contends that Plaintiff Organizations lack standing in this case based on a flawed reading of *Fair Elections Ohio v. Husted,* 770 F.3d 456 (6th Cir. 2014). But unlike *Fair Elections*, Plaintiffs here have presented extensive evidence that they have been forced to expend and divert resources and additionally rely on *associational* standing because they are membership organizations. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.* (TOC), Inc., 528 U.S. 167, 181 (2000) ("[a]n association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit."); *accord Sierra Club v. E.P.A.*, 754 F.3d 995, 999 (D.C. Cir. 2014) (recognizing associational standing based on alleged harm to members). Plaintiff Organizations' members have individual, legally-protectable interests in seeking to persuade other citizens to register to vote, as well as in registering to vote themselves, without the procedural hurdles that the Executive Director's unlawful actions have thrown in their way.

[2] The Secretary's supposed ability to add registrants to the voter rolls in August does not resolve the harm Plaintiffs are experiencing and will continue to experience. First, applicants who read the requirements but do not possess documentary proof of citizenship will simply not apply to register, and the Secretary has no methodology for locating those individuals and adding them to the rolls. Second, voter registration drives take place continuously and specific events are scheduled throughout the coming months. *See* Permaloff Supp. Decl. ¶¶ 6-9 (Dkt. #47-6). The real-time loss of the opportunity to help voters register, and the deprivation of the right to register to vote, are quintessential irreparable harms.

have been possible, has caused them to expend significantly more effort on less effective ways of helping citizens register. *See* Leonard Decl. ¶ 24 (Dkt. #13-1).  Kansas has been a laboratory for the burdens of requiring documentary proof of citizenship, and its experience is likely to be repeated in Georgia and Alabama once those states implement their documentary proof requirements. Kansas's proof-of-citizenship requirements have injected taxing inefficiencies into the registration process and have reduced the number of voters Plaintiffs can register.  *See* Furtado Decl. ¶¶ 18-26 (Dkt. #13-7).  For example, instead of spending their time and resources registering additional voters, League members recently made 115 home visits in a single county to help registrants on Kansas's suspense list complete their registrations by submitting proof-of-citizenship documentation.  *See id.* ¶ 37.  This took 32 hours and yielded only 30 completed registrations.  *See id.*  In certain Kansas counties, the difficulty of navigating the requirements of the Executive Director's decision has become so prohibitive that the League of Women Voters of Kansas temporarily cancelled registration drives for the first time in its history.[3]

In Alabama and Georgia, Plaintiffs are currently being irreparably harmed because of the confusion caused by the Executive Director's decision.[4]  As a direct result of that decision, the Federal Form's state-specific instructions now *incorrectly* instruct applicants in Alabama that

---

[3] The Secretary argues that vacating the Executive Director's decision will cause great confusion among voters in Kansas.  *See* Tr. 82:18 – 83:3.  But confusion has long existed in Kansas and is of the Secretary's own making.  Any additional confusion stems from the fact that Kansas (unlike Alabama and Georgia) is now suddenly requiring documentary proof of citizenship from Federal Form users for the first time in 20 years.  Vacating the Executive Director's decision will alleviate this confusion by returning to the long-standing practice in Kansas (indeed, everywhere in the country) of allowing eligible voters to register using the Federal Form without documentary burdens.  Moreover, any purported administrative burdens Kansas might face from a preliminary injunction reverting back to the Federal Form as it existed prior to January 29, 2016, are dwarfed by the harm incurred by Plaintiffs and voters in the absence of a preliminary injunction.  Kansas could easily minimize the amount of effort required by local election officials by instructing officials to segregate the forms of Federal Form applicants that were not accepted because they lacked proof of citizenship from the state form applications that were rejected.

[4] Alabama and Georgia's delay in implementing the Executive Director's decision does not lessen the need for an injunction.  If anything, that lack of implementation supports preliminary relief by undermining the argument (however weak) that a preliminary injunction in Alabama and Georgia would simply preserve the status quo.  Those States' non-enforcement of their documentary proof requirements also raises the question of whether the Executive Director's actions approving Georgia and Alabama's requests was nothing more than "cover" for approving Kansas's requests, where Mr. Newby was a Kansas elections official.

they must provide "satisfactory evidence of United States citizenship" in order to be properly registered.  Schmidt Dec. Ex. 6 at 9 (Dkt. #11-16).  The Federal Form also misinforms potential voters in Georgia that they will only "be found eligible to vote by supplying satisfactory evidence of U.S. citizenship."  *Id.* at 13.  Voters in Alabama and Georgia who consult the state-specific instructions on the Federal Form thus continue to be incorrectly instructed that they must produce proof of citizenship in order to cast their ballot.

At a minimum, this introduces significant confusion into the voting and registration processes in these states.[5]  More significantly, it discourages eligible voters from registering or voting at all if they do not have the documents purportedly required in these states, or cannot afford the cost of obtaining a passport or a replacement birth certificate.  It also puts Plaintiff organizations in an uncertain position because there is no way for Plaintiffs and members of the general public to know when Georgia or Alabama eventually *do* decide to implement their proof of citizenship laws.  Georgia and Alabama have provided no public guidance to indicate whether the proof-of-citizenship laws are being enforced or when they will be enforced (other than the last-minute affidavits they submitted at both of the hearings in this case).  Many organizations and individuals that wish to run voter registration programs have no way of determining the current state of the Form's requirements for those states *other* than the instructions provided.  Moreover, although the Federal Form instructions were evidently wrong as of February 22, and still wrong as of March 9, there is currently no legal barrier to Georgia and Alabama electing to implement the proof of citizenship laws at any time.  This uncertainty causes enormous confusion and risk to Plaintiff organizations who, in trying to educate voters, could inadvertently

---

[5] In litigation in the District Court of Kansas, the Secretary previously argued that irreparable harm is established when "voters [ ] suffer confusion in their own individual voter registrations and eligibility to vote in certain elections[.]" Keats 3/8/16 Aff. Ex. 9 at 25 (Dkt. #55-10); *see also* Pls.' 3/8/16 Repl. Mem. at 14 (Dkt. #55).

provide outdated information that negatively impacts whether persons are able to register to vote.[6]

*Third*, the Executive Director's decision has forced Plaintiff organizations to expend substantial resources to educate voters and to comply with the new requirements. In response to this Court's inquiry, and contrary to what the Secretary says, this amounts to far more effort and expense than "modifying one line" of their voter registration materials.[7] *See* Tr. 3/9/16 Hr'g 54:24 ("Tr."). Even when using the Federal Form, Plaintiffs are now forced to expend additional resources, invest in new training materials, conduct home visits, and re-educate staff and voters. *See* Furtado Decl. ¶¶ 15-39 (Dkt. #13-7). For example, the Kansas League had invested $7,000 in a training module that was based on the prior Federal Form, which is now rendered obsolete by the Executive Director's decision; a new module would require additional resources. *See id.* ¶ 39. The Kansas League has also spent over $13,000 in recent years to produce new educational materials addressing the proof of citizenship requirement, and is continuing to spend money in response to the Executive Director's decision. *See id.* ¶¶ 38-39. Such economic harm is both cognizable injury and irreparable. *Smoking Everywhere, Inc. v. U.S. Food & Drug Admin.*, 680 F. Supp. 2d 62, 77 n.19 (D.D.C. 2010).

In Alabama and Georgia, Plaintiffs will be forced to spend substantial organizational resources and energy investigating implementation and attempting to provide accurate information to voters while protecting themselves from potential risk of inadvertently providing inaccurate information. Moreover, there is every reason to believe that Alabama and Georgia

---

[6] The Executive Director himself acknowledges that voter confusion is particularly harmful in the run-up to a presidential election. We are entering "a busy voter participation year with the expectation that prospective voters will frequently be coming to the EAC website to learn about registering to vote. There is a heightened need to have the instructions current and consistent." Newby Mem. at 1-2 (Dkt #28-1).

[7] Kansas's comparison of documentary proof of citizenship requirements to the Help America Vote Act's first-time voter identification requirement is nonsensical. HAVA permits a broad range of identification, including a utility bill, but does not require documentary proof of citizenship.

*will* begin to implement the Executive Director's decision before Plaintiffs can obtain relief on the merits, in which case Plaintiffs will also lose the Federal Form backstop in these states.[8] Plaintiffs would be forced to produce entirely new registration materials on very limited resources, retrain staff and volunteers, and potentially need to divert resources to assist applicants in obtaining or submitting documentation. Documentary proof-of-citizenship would greatly interfere with their current planned registration activities in these states. In Georgia, the Secretary of State has twice represented that it may begin to implement the Executive Director's decision, only to announce through the Secretary at hearings in this matter. *See* Fleming 2/22/16 Aff.; Fleming 3/9/16 Aff. The Georgia League has continued planning registration activities, *see* Poythress Supp. Decl. ¶¶ 6-10 (Dkt. #47-7), but must do so with no clarity as to Georgia's plans. Alabama's League also has drives planned; that state promised to suspend enforcement only through March 1, despite the Secretary's assurances that the state is "behind." Tr. 51:5.

For these reasons, Plaintiffs have been irreparably harmed by the Executive Director's unauthorized action to require documentary proof of citizenship with the Federal Form because they have been forced to spend substantial organizational resources to comply with unlawful and onerous proof-of-citizenship requirements.

      B.    *Court Decisions Make Clear That Practices, Like the Documentary Proof Requirement, That Impede Voter Registration Drives Cause Irreparable Harm to Groups Like Plaintiffs*

The case-law around the country overwhelmingly holds that any practice that materially interferes with the ability of groups like Plaintiffs to conduct effective voter registration irreparably harms those groups. Plaintiffs have abundantly documented the real and immediate

---

[8] The Secretary's incorrect assertion that Plaintiffs would not be harmed by proof of citizenship requirements on the Federal Form in Kansas because of preexisting requirements for the state form is also wholly irrelevant to Alabama and Georgia, which have not yet enforced documentary proof of citizenship for state elections. Accordingly, this would be a wholly new burden for Plaintiffs in those two states.

harm caused by the Executive Director's unlawful decision.  This harm gravely burdens Plaintiffs' core mission of promoting civic participation by conducting voter registration drives, an activity protected by the First Amendment, and cannot be compensated through later relief because once an opportunity to register a voter is lost, "the opportunity is gone forever."  *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155, 1167 (N.D. Fla. 2012).[9]

In this Circuit, an injury is irreparable if "no 'adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation.'"  *Mexichem Specialty Resins, Inc. v. E.P.A.*, 787 F.3d 544, 555 (D.C. Cir. 2015) (quoting *Wisc. Gas Co.*, 758 F.2d at 674).  Courts employ a "sliding scale" approach, and may grant such relief if the plaintiff presents a strong probability of success on the merits while demonstrating a likelihood of  "at least some injury."  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal quotation marks omitted).  Thus, "because strong arguments on one factor can make up for weak ones on another, [denial of a preliminary injunction would not necessarily be appropriate] solely because of the weakness of [movant's] showing on [irreparable harm]."  *Republican Nat'l Comm. v. Fed. Election Comm'n*, 172 F.3d 920 (D.C. Cir. 1998) (internal citations omitted).  Plaintiffs have shown a clear likelihood of success on the merits; indeed, they have proven their case.  Even though the Court could enter a preliminary injunction on this strong showing alone, Plaintiffs have also established immediate and irreparable harm as a matter of law.

Courts across the country have routinely found that state restrictions on the voter registration process constitute irreparable harm.  For example, the Eleventh Circuit, which

---

[9] As the Supreme Court has found, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Such irreparable injury is established when the plaintiff's protected activity is "either threatened or in fact being impaired at the time relief was sought."  *Id.*

includes Georgia and Alabama, has recognized that voter registration organizations have a legally cognizable protected interest in holding meaningful registration drives and helping voters exercise their right to vote. *See Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1353 (11th Cir. 2005) (affirming district court's grant of a preliminary injunction against Georgia's decision to refuse to accept "bundled" registration applications submitted by registration organization).[10]

Other courts likewise have held that introducing restrictions on voter registration activities imposes irreparable injury to voters and organizations alike:

- In *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224 (4th Cir. 2014), the Fourth Circuit found that registration organizations (including the North Carolina chapter of the League of Women Voters) suffered irreparable harm under a North Carolina law that restricted same-day voting registration and out-of-precinct voting. *See id.* at 247. The court held that these restrictions irreparably injured the interests of the organizations regardless of whether the number of adversely affected voters was "thirty or thirty-thousand" because "once the election occurs, there can be no do-over and no redress. The injury to these voters is real and completely irreparable if nothing is done to enjoin this law." *Id.*

- In *League of Women Voters of Florida v. Browning*, 863 F. Supp. 2d 1155 (N.D. Fla. 2012), the District Court for the Northern District of Florida preliminarily enjoined a Florida law that required registration organizations to deliver completed registration applications within 48 hours and effectively prevented such organizations from mailing these applications. *See id.* at 1158. The court found that registration organizations (including the Florida chapter of the League of Women Voters) suffered irreparable harm under the law "first because the denial of a right of this magnitude under circumstances like these almost always inflicts irreparable harm, and second because when a plaintiff loses an opportunity to register a voter, the opportunity is gone forever." *Id.* at 1167.

---

[10] This Circuit also has recognized that irreparable injury may be established by a showing that an impermissible government action chills, or threatens to chill, parties from engaging in First Amendment-protected activities. *See National Treasury Employees Union v. King*, 961 F.2d 240, 244-45 (D.C. Cir. 1992) (noting that unconstitutional restrictions on plaintiff union's ability to acquire campaign signatures prior to an election would cause "a grievous harm through the intervening loss of its free speech rights," and that "its ability to organize a campaign will be irreparably damaged."); *Chaplaincy of Full Gospel Churches*, 454 F.3d at 299-03 (finding allegation of Establishment Clause violation constitutes irreparable harm *per se*); *Wrenn v. District of Columbia*, No. 15-162 (CKK), 2016 WL 912174, at *12 (D.D.C. Mar. 7, 2016) ("'[A]lthough a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes.'" (quoting *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013)).

The court issued this injunction in May 2012—more than five months before the coming November presidential election.

- In *Obama for America v. Husted*, 697 F.3d 423 (6th Cir. 2012), the Sixth Circuit sustained a preliminary injunction against an Ohio law that restricted the time for early voting. Relying on the principle that irreparable harm is established when a plaintiff's injury is not compensable through monetary damages, the court held that "[a] restriction on the fundamental right to vote [ ] constitutes irreparable injury" because "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed." *Id.* at 436.

- In *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 699 (N.D. Ohio 2006), the District Court for the Northern District of Ohio issued a preliminary injunction against an Ohio law that required compensated voter registration workers to undergo pre-registration and online training, and required completed registration forms to be submitted "personally" by workers to election officials. The court found that plaintiff registration organizations (including Project Vote) had provided sufficient evidence of irreparable injury because these organizations "will continue to be dissuaded from engaging in an important political activity, and will no longer enjoy the freedom they once had to enthusiastically register Ohio citizens to vote, and to encourage participation in the political process." *Id.* at 707-08.

- In *Washington Association of Churches v. Reed*, 492 F. Supp. 2d 1264 (W.D. Wash. 2006), the District Court of the Western District of Washington issued a preliminary injunction against a Washington matching law that required election officials to match a potential voter's name to records in the state's driver's license or Social Security databases. *See id.* The court found that at least 178 applicants had not had their registrations completed because of the law. See *id.* at 1271. The court rejected the defendants' argument that the plaintiffs' evidence was "theoretical" and that the problems with the incomplete applications were "just details that can be easily cured[,]" finding that "such harm is not theoretical, it is actual. More importantly, the Court does not consider a person's right to vote a mere 'detail' to be so easily dismissed." *Id.*

In sum, courts have repeatedly and consistently recognized that restrictions that make it harder to help citizens register to vote inflict irreparable injury on Plaintiff organizations.[12] Such restrictions injure voters and the protected interests of the organizations dedicated to helping

---

[12] Courts more generally find that impairments on the right to vote impose irreparable harm. In *Williams v. Salerno*, 792 F.2d 323 (2d Cir. 1986), the Second Circuit held that the decision of state and county election officials preventing students from registering to vote in college communities constituted irreparable harm. *Id.* at 326 ("[R]egistration applicants . . . would certainly suffer irreparable harm if their right to vote were impinged upon"). Similarly, in *Boustani v. Blackwell*, 460 F. Supp. 2d 822 (N.D. Ohio 2006), the District Court for the Northern District of Ohio granted a permanent injunction against an Ohio law requiring naturalized citizens to provide documentary proof of citizenship in order to register to vote. The court held that "[t]he loss of the protected right to vote 'for even minimal periods of time, constitutes irreparable injury.'" *Id.* at 827 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

them register.  Plaintiffs have demonstrated a strong likelihood of success on the merits given the numerous APA violations committed by the Executive Director, and are suffering ongoing injury as a result of his unauthorized decision.  *See* Pls.' 2/17/16 Mem. at 32-41 (Dkt. #11-1). Therefore, the burdens borne by Plaintiffs caused by the Executive Director's actions have caused irreparable injury to Plaintiffs' core interests of helping more individuals exercise their fundamental right to vote.

## II. Remand to the Executive Director or for "Appeal" to the Commission is an Inappropriate Remedy

### A. *Remand to the Executive Director is Improper*

There is no basis for remand to the Executive Director here.  Under the 2015 Management Policy, the Executive Director was free to recommend a course of action to the Commission, and remains free to do so now, but he never had any authority to unilaterally grant the States' latest requests on the EAC's behalf.  As such, remand to the Executive Director seeking further explanation for his unlawful action would be a futile exercise.  The Executive Director already has submitted a private memorandum (which should not properly be part of the administrative record) that encapsulates his flawed process and analysis; even if the Executive Director could somehow rewrite that document to present a coherent rationale for changing 20 years of consistent policy and precedent against documentary proof with the Federal Form, remanding to the Executive Director would not alter the fact that he lacked authority in the first place to grant the States' requests.

In this context, the Secretary's mistakenly relies on *Menkes v. U.S. Dep't of Homeland Sec.*, 637 F.3d 319 (D.C. Cir. 2011), because *Menkes* presupposes that the "further articulation" of the agency's ruling *post hoc* is made by "the proper decisionmaker."  *Menkes*, 637 F.3d at 337 (quoting *Local 814, Int'l Brotherhood of Teamsters v. NLRB*, 546 F.2d 989, 992 (D.C. Cir. 1976)

(per curiam)). The Executive Director was *not* the "proper decisionmaker" and no manner of post-hoc rationalization can alter the fact that he did not act with the approval of three Commissioners.

### B. Remand Without Vacatur Would Circumvent HAVA

The Secretary also asserted at oral argument that the Department of Justice seeks to bypass the legal process and achieve "victory in the case without even having to win on the merits," by seeking to simply vacate the Executive Director's actions. Tr. 83:6. The Secretary claims that vacatur and remand to the Commission will operate as a *de facto* rejection of the States' requests because "every time the EAC . . . addressed this issue . . . it split on the two partisan grounds." Tr. 83:10-12. This is precisely why the Secretary sought unilateral action by the Executive Director: He knew that the bipartisan Commission would not muster three Commissioner votes in support of changing the EAC's longstanding policy against documentary proof of citizenship. It is the *Secretary's* approach that seeks to sidestep HAVA's three-vote requirement: By leaving the Executive Director's unlawful decision in place, with remand to the Commission operating as a *de facto* appeal, the Secretary hopes that the Executive Director's order would remain in effect. The Secretary thereby seeks to achieve his own desired outcome by advocating an approach that would permit the Executive Director—unrestrained by statutory bipartisan controls—to circumvent EAC procedure and take an action that three Commissioners would not approve.

It likewise would be inappropriate to remand the issue of the Executive Director's authority to a "majority" Commission decision. The Commission's 2015 Management Statement is clear and unambiguous on its face, and lacks any delegation of authority to the Executive Director to change the Commission's longstanding precedent against documentary

-13-

proof of citizenship. A remand to the Commissioners for clarification of the Executive Director's authority therefore is not required. Moreover, HAVA requires all Commission actions to be approved by at least *three* Commissioners to be valid. 52 U.S.C. § 20928. Thus, any interpretation of the Executive Director's authority under the 2015 Management Policy with respect to documentary proof of citizenship also would require a unanimous vote of all three Commissioners to represent a valid EAC decision. Commissioner Hicks has dissented from the Executive Director's actions and stated that the Executive Director lacked authority. *See* Keats 3/6/16 Aff. Ex. 1 (Dkt. #47-2). Regardless of how the Secretary wishes to repackage a remand to the Commission, the record already shows that three Commissioners do not agree that the Executive Director had authority to decide the question of documentary proof of citizenship.

Simply put, the Secretary and the Executive Director seek to improperly bypass HAVA's requirement that three Commissioners approve *any* action taken by the Commission. If the decision was instead vacated, the Commission would be free to consider the issue and act within its proper authority to issue a valid decision. Of course, the Secretary would be free to challenge the merits of an EAC rejection of the proof of citizenship requirement—but he has already done just that and lost.

### III.    This Court Need not Resolve the Privilege Issue to Rule on the Merits

This Court need not resolve the attorney-client privilege issues with respect to the McCormick deposition. For reasons cited in Plaintiffs' motion to exclude Commissioner McCormick's testimony (Dkt. #54), there are numerous bases for excluding Commissioner McCormick's deposition testimony. But more fundamentally, the Intervenor Defendants' obsession with delegitimizing the Commission's 2014 decision has no bearing on whether the Executive Director's actions in *January 2016* were authorized by law. The EAC's policy against documentary proof of citizenship dates back to Congress's 1993 enactment of the NVRA

-14-

without requiring documentary proof of citizenship. The FEC through rulemaking determined documentation related to citizenship was not necessary to determine voter eligibility.[19] The EAC adopted this rule without revision, and declined on multiple occasions prior to 2014 to permit documentary proof of citizenship with the Federal Form.[20] Simply put, the Acting Executive Director in 2014 did not write on a blank page and only had a limited delegation of authority to continue to enforce prior EAC precedent. Accordingly, the outcome of Kansas and Arizona's requests in 2014, as the Tenth Circuit itself recognized, likely would have been no different. *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1198 (10th Cir. 2014). Therefore, the privilege issues arising from Ms. McCormick's deposition need not be resolved.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a preliminary injunction.

March 21, 2016

Respectfully submitted,

By: /s/ Michael Keats

Michael C. Keats**
Joel T. Dodge*
STROOCK & STROOCK &
LAVAN LLP
180 Maiden Lane
New York, New York 10038
(212) 806-5400
mkeats@stroock.com

---

[19] *See* 59 Fed. Reg. 32, 316 (June 23, 1994).

[20] *See* Letter from Thomas Wilkey, Executive Director, to Arizona (Mar. 6, 2006), AR0233 (Dkt. #69-1); Certification of Tally Vote (July 11, 2006), AR0245; Thomas Wilkey, State Requests to Change Their State-Specific Instructions on the National Mail Voter Registration Form (Nov. 9, 2011), AR0217; Summary of State Requests to Modify Their State-Specific Instructions on the NVRA Mail Application (2007-2014), AR0219; Letter from Alice Miller, Acting Executive Director, to Kansas (Jan. 17, 2014), AR0282; Letter from Alice Miller, Acting Executive Director, to Arizona (Jan. 17, 2014), AR0332.

- and –

Amelia J. Schmidt
  D.C. Bar No. 1012380
STROOCK & STROOCK &
LAVAN LLP
1875 K Street NW
Washington, DC 20006
(202) 739-2800
aschmidt@stroock.com

Wendy R. Weiser\*\*
Jonathan Brater\*
Tomas Lopez\*
Robert Ferguson\*
BRENNAN CENTER FOR
JUSTICE
161 Avenue of the Americas, 12th Floor
New York, New York 10013
(646) 292-8310
wendy.weiser@nyu.edu

Susan M. Davies
   D.C Bar No. 1015133
   D.D.C. Atty. No. 54867
Jonathan D. Janow
   D.C. Bar No. 1002399
   D.D.C. Atty. No. D00333
KIRKLAND & ELLIS LLP
655 Fifteenth Street, NW, Suite 1200
Washington, DC  20005
(202) 879-5000
susan.davies@kirkland.com

*Attorneys for Plaintiffs the League of Women Voters of the United States, the League of Women Voters of Kansas, the League of Women Voters of Alabama, and the League of Women Voters of Georgia*

Dale E. Ho

   D.D.C. Bar No. NY0142
Orion Danjuma*
AMERICAN CIVIL LIBERTIES
  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
dale.ho@aclu.org

Stephen Douglas Bonney*
ACLU FOUNDATION OF
KANSAS
6701 W. 64th Street, Ste. 210
Overland Park, KS 66202
(913) 490-4102
dbonney@aclukansas.org

Jon M. Greenbaum
  D.C. Bar No. 489887
Ezra D. Rosenberg
  D.C. Bar No. 360927
LAWYERS' COMMITTEE FOR
  CIVIL RIGHTS UNDER LAW
1401 New York Avenue, NW
Suite 400
Washington, DC 20005
(202) 662-8600
jgreenbaum@lawyerscommittee.org

*Attorneys for Plaintiffs Marvin Brown, JoAnn Brown, the Georgia State Conference of the NAACP, and Georgia Coalition for the People's Agenda*

Linda Stein
  D.C. Bar No. 376217
Errol R. Patterson
  D.C. Bar No. 379715
Jason Abel
  D.C. Bar No. 490382
STEPTOE & JOHNSON LLP
1330 Connecticut Avenue, NW
Washington, DC 20036-1795
(202) 429-3000
lstein@steptoe.com

*Attorneys for Plaintiffs the Georgia State Conference of the NAACP, and Georgia Coalition for the People's Agenda*

John A. Freedman
  D.C. Bar. No. 453075
ARNOLD & PORTER LLP
601 Massachusetts Ave., N.W.
Washington, DC  20001
(202) 942-5000
John.Freedman@aporter.com

Michelle Kanter Cohen
  D.C. Bar No. 989164
PROJECT VOTE
1420 K Street, 7th Floor
Washington, DC 20005
(202) 546-4173
mkantercohen@projectvote.org

*Attorneys for Plaintiff Project Vote*

*\*Pro hac vice motion pending*
*\*\*Admitted pro hac vice*