# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, et al.,** | ) ) ) | |
| **Plaintiffs,** | ) ) ) | |
| v. | ) ) | **Civil Case No. 16-236 (RJL)** |
| **BRIAN D. NEWBY,** in his capacity as the Executive Director of the United States Election Assistance Commission, and **UNITED STATES ELECTION ASSISTANCE COMMISSION,** | ) ) ) ) ) ) | |
| **Defendants,** | ) ) | |
| **KANSAS SECRETARY OF STATE KRIS W. KOBACH** and **PUBLIC INTEREST LEGAL FOUNDATION,** | ) ) ) ) | |
| **Defendant-Intervenors.** | ) | |

**FILED**

**JUN 2 9 2016**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

## MEMORANDUM OPINION
(June 29, 2016) [Dkt. #11]

On January 29, 2016, the Executive Director of the United States Election Assistance Commission ("EAC" or "Commission") Brian Newby granted Kansas's, Georgia's, and Alabama's requests to modify the instructions on the National Mail Voter Registration Form ("the Federal Form") to direct voter registration applicants in those three states to submit proof of their United States citizenship in accordance with the states' respective laws and regulations. Shortly thereafter, a modified version of the Federal Form was posted on the EAC's website. Plaintiffs argue Newby acted outside the scope of his

authority and in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Presently before the Court is plaintiffs' Motion for a Preliminary Injunction [Dkt. #11], requesting that I void Newby's changes to the Federal Form and vacate the letters granting Kansas's, Georgia's, and Alabama's requests by ordering defendants to immediately reverse the changes on the Federal Form and on the EAC website, to immediately withdraw the letters, and to instruct election officials in those states to replace physical copies of the modified Federal Form with reinstated, unmodified versions that do not include the documentary proof of citizenship requirements at issue. *See* Pls.' Proposed Order 1–2 [Dkt. #11-22]. Upon consideration of the parties' pleadings and oral arguments, the brief of Amicus Curiae Landmark Legal Foundation, the relevant law, and the entire record herein, plaintiffs' Motion is DENIED.

## BACKGROUND

The Elections Clause of the Constitution states, "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof, but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Acting under its Elections Clause authority, and in order to "increase the number of eligible citizens who register to vote in elections for Federal office," Congress directed the Federal Election Commission ("FEC"), "in consultation with the chief election officers of the States," to create a single federal voter registration form that "[e]ach State shall accept and

use" to register voters for elections for federal office via mail.[1]  National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. §§ 20501(b)(1); 20505(a)(1); 20508(a)(1).  That responsibility has since been conferred upon the EAC.  *Id.* §§ 20508, 20929.  The NVRA set certain requirements for the contents of the Federal Form.  *Id.* § 20508(b).  Of relevance here, the Federal Form "may require only such identifying information . . . and other information . . . as is necessary to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process."  *Id.* § 20508(b)(1).  Moreover, the form is to "include a statement that – (A) specifies each eligibility requirement (including citizenship), (B) contains an attestation that the applicant meets each such requirement, and (C) requires the signature of the applicant, under penalty of perjury."  *Id.* § 20508(b)(2).  Finally, states must "ensure that any eligible applicant" who submits a complete Federal Form by the relevant deadlines "is registered to vote" in an election for federal office.[2] *Id.* § 20507(a)(1).

Pursuant to authority granted in the NVRA, the FEC promulgated further requirements regarding the Federal Form through regulations, including that the Federal Form "shall list U.S. Citizenship as a universal eligibility requirement, 11 C.F.R § 9428.4(b)(1), and must also "[p]rovide a field on the application for the signature of the applicant, under penalty of perjury, and the date of the applicant's signature," *Id.*

---

[1] The NVRA's requirements apply to 44 states—including Kansas, Georgia, and Alabama—and the District of Columbia.  Six states are exempt from the NVRA by virtue of maintaining no registration requirements for federal elections or by continuously providing for election-day registration since 1994.  *See* 52 U.S.C. § 20503(b).
[2] The NVRA "requires States to provide simplified systems for registering to vote in *federal* elections, *i.e.*, elections for federal officials, such as the President, congressional Representatives, and United States Senators."  *Young v. Fordice*, 520 U.S. 273, 275 (1997).

§ 9428.4(b)(3).  The Federal Form must also "include a statement that incorporates by reference each state's specific additional eligibility requirements (including any special pledges) as set forth in the accompanying state instructions." *Id.* § 9428.4(b)(1). Examples of state-specific instructions are those explaining "what type of voter identification number, if any, is required or requested by the applicant's state," and whether "the applicant's state is a closed primary state." *Id.* § 9428.4(a)(6)(i); (7)(i).

Congress established the Election Assistance Commission through The Help America Vote Act of 2002 ("HAVA"). The HAVA specified that the "Commission shall have four members appointed by the President, by and with the advice and consent of the Senate."[3]  52 U.S.C. §§ 20921, 20923(a)(1).   Among other functions, the HAVA transferred authority over the Federal Form from the FEC to the newly formed EAC. *Id.* §§ 20508, 20929.  The HAVA specifies that "[a]ny action which the Commission is authorized to carry out under this Act, may be carried out only with the approval of at least three of its members." 116 Stat. 1666, 1678.[4] The NVRA, the HAVA, and the associated regulations do not, however, set forth a particular process for EAC review of proposed

---

[3] The Court will refer to the members of the Commission as "commissioners" or "members."

[4] When the HAVA was codified, the language entered into the United States Code was "[a]ny action which the Commission is authorized to carry out under this chapter [that is, Chapter 209,] may be carried out only with the approval of at least three of its members." 52 U.S.C. § 20928. As the EAC's authority over the Federal Form derives from a different chapter of the Code—Chapter 205—the codified version could cause one to conclude the three-vote requirement does not apply when the EAC is exercising its authority over the Federal Form. However, unless a title of the U.S. Code has been enacted into positive law, "[i]t is well-settled that . . . the United States Code is prima facie evidence of what the law is[ and that] the Statutes at Large constitutes legal evidence of what the law is.  When the two differ, the Statutes at Large controls." *Cheney R. Co. v. R.R. Ret. Bd.*, 50 F.3d 1071, 1076 (D.C. Cir. 1995) (internal citations omitted). As Title 52 of the United States Code has not been enacted into positive law, the Statute at Large version of the HAVA controls here, and it makes the three-member requirement applicable to actions taken in regards to the Federal Form. Help America Vote Act, Pub. L. No. 107-252, § 208, 116 Stat. 1666, 1678 (2002).

state-specific instructions. Instead, the practice has varied over the years and at times has been "entirely informal." *Arizona v. Inter Tribal Council of Arizona, Inc.* [hereinafter "*ITCA*"], 133 S. Ct. 2247, 2260 n.10 (2013); *see also* Defs.' Resp. to Pls.' Mot. for TRO and Prelim. Inj. 5–6 [Dkt. #28].

In essence, the Federal Form is a voter registration application for would-be voters to fill out. Notably, the first question on the application is, "Are you a citizen of the United States of America?" Federal Form 5 [Dkt. #11-16]. Applicants may check either a box for "Yes" or "No." *Id.* at 5. A statement next to the signature box at the end of the application reads, "I have reviewed my state's instructions and I swear/affirm that: I am a United States citizen . . . [and t]he information I have provided is true to the best of my knowledge, under penalty of perjury." *Id.* at 5. The application is attached to both general instructions for all applicants and a state-by-state guide that includes state-specific instructions "which tell residents of each State what additional information they must provide and where they must submit the form." *ITCA*, 133 S. Ct. at 2252. "Each state-specific instruction must be approved by the EAC before it is included on the Federal Form." *Id.* Some states, including Kansas, Georgia, Alabama, and Arizona, additionally list U.S. citizenship as a requirement in their respective state-specific instructions. Federal Form 9–10, 12–15.

On November 17, 2015, Kansas submitted a request that the EAC modify its state-specific instructions to include its proof of citizenship requirement.[5] Letter from Bryan

---

[5] This was not Kansas's first attempt to request modification of the Federal Form to reflect its documentation of citizenship requirement for voter registration. For example, in 2013, Kansas submitted a similar request that was rejected by the EAC. *See Kobach v. EAC*, 772 F.3d 1188, 1188–89 (10th Cir. 2014), *cert. denied*, 135 S. Ct. 2891 (2015). In subsequent litigation challenging the EAC's decision, the Court of Appeals for the Tenth Circuit ruled in favor of the Commission. *Id.* at 1199.

Caskey to Brian Newby [hereinafter "Kansas Request"] [Dkt. #11-11].   The request included a proposed instruction setting forth the requirement under Kansas law that voter registration applicants prove their U.S. Citizenship by submitting one of thirteen types of acceptable documentary evidence, Kan. Stat. Ann. § 25-2309(*l*), or through an alternative process that involves the use of witnesses, *id.* § 25-2309(m).   Kansas Request 1–2.   The request noted that Kansas's regulations had recently been amended and that applicants now have 90 days from the date they submit their application to provide the necessary documentation of citizenship.   Kansas Request 1 (citing Kan. Admin. Regs. § 7-23-15). Kansas also provided the EAC with a spreadsheet identifying instances of noncitizens registering or attempting to register to vote in Sedgwick County, Kansas.   Kansas Request 4–5.   On November 19, 2015, Newby wrote to Kansas's Election Director to report that the request was under review.   Letter from Brian Newby to Bryan Caskey [Dkt. #11-12].

Also pending before the EAC at the time was a request made by Alabama on December 18, 2014 that its state-specific instructions be amended, *inter alia*, to provide that "an applicant may not be registered until the applicant has provided satisfactory evidence of United States citizenship." Letter from Jim Bennett to EAC Commissioners 2 [Dkt. #11-17].   Under Alabama law, voter registration applicants must submit one of thirteen forms of documentary evidence of citizenship, or prove citizenship by submitting alternative evidence at a hearing before the county board.   Ala. Code § 31-13-28(k)–(*l*). Georgia's request, submitted on August 1, 2013, asked the EAC to modify its state-specific instructions to inform applicants they must "be found eligible to vote by supplying

satisfactory evidence of citizenship."[6] Letter from Brian P. Kemp to Alice Miller [Dkt. #11-18]. Georgia law states that voter registration applicants must demonstrate citizenship. Ga. Code Ann. § 21-2-216(g). In some cases an applicant may satisfy this requirement by providing his or her driver's license or state identification card numbers or a photocopy of the license or identification card. *Id.* § 21-2-216(g)(2)(A). Otherwise, an applicant may submit one of several other forms of documentary evidence or may demonstrate citizenship through alternative processes. *Id.* § 21-2-216(g)(2)(B)–(G).

In evaluating Kansas, Alabama, and Georgia's requests, the EAC did not undergo notice and comment rulemaking. The Commission had at that time, and continues to have, only three commissioners, and the commissioners did not formally consider or vote upon the states' requests. Instead, on January 29, 2016, the EAC's Executive Director Brian Newby notified Kansas, Alabama, and Georgia via letters that he had approved their requests. Letter from Brian Newby to Bryan Caskey [Dkt. #11-15]; Letter from Brian Newby to John H. Merrill [Dkt. #11-19]; Letter form Brian Newby to Brian P. Kemp [Dkt. #11-20]. The approved modifications to the state-specific instructions were promptly inputted, and a new version of the Federal Form was posted on the EAC website.[7] Newby's

---

[6] Plaintiffs maintain that the Georgia request that Newby granted was not a pending request but instead was a request that had already been denied by former EAC Executive Director Alice Miller on January 17, 2014. Pls.' Mem. of P&A in Supp. of Mot. for TRO and Prelim. Inj. 17 [hereinafter "Pls.' Mem."] [Dkt. #11-1].
[7] In the 2014 election cycle, Kansas employed a bifurcated system in which Federal Form applicants, who at that time were not instructed to submit documentation of citizenship, were registered to vote only in federal—and not state—elections. TRO Hearing Tr. 71–72 (Feb. 22, 2016) [Dkt. #37]. Since Newby's modification of the Federal Form, Kansas has begun requiring documentation of citizenship from Federal Form applicants for registration to vote in federal elections as well. Pls.' Mem. 19. On the record before this Court, Alabama and Georgia are not currently enforcing their proof of citizenship requirements as to Federal Form applicants. *See* Pls. Supplemental Mem. in Supp. of Prelim. Inj. 2, 3 [Dkt. #71]; Aff. of John H. Merrill [Dkt. #51-5]; Aff. of Timothy K. Fleming [Dkt. #51-1].

letters were matter of fact and did not contain any explanation as to how he reached his decisions. He did, however, provide an explanation in a roughly contemporaneous internal memorandum dated February 1, 2016.[8]  *See* Brian D. Newby, Acceptance of State-Instructions to Federal Form for Alabama, Georgia, and Kansas [hereinafter "Newby Mem."] [Dkt. #28-1].  Newby explained that several states' requests to modify their respective voter instructions were awaiting review when he became Executive Director in November 2015.  Newby Mem. 1.  Feeling a sense of urgency given the upcoming presidential elections, Newby stated he worked quickly to develop a process for considering and ultimately resolving the requests.  Newby Mem. 1–2.  He considered "[s]tate-specific instructional changes [to be] ministerial, and thus, routine," and concluded therefore that "[t]he Executive Director [was to] review the request [only] for clarity and accuracy."  Newby Mem. 2.  Newby also explained that—in his view—review of proposed state-specific instructions was not a "policy" function that would require the commissioners' approval under their February 24, 2015 "Election Assistance Commission Organizational Management Policy Statement," which, *inter alia*, set forth in general terms the respective responsibilities of the commissioners and the EAC's Executive Director.  Newby Mem. 4; *see also* Policy Statement [Dkt. #11-8].  Unlike changes to the Federal Form itself, Newby stated, alterations to state-specific instructions impact only that individual state to which they apply, and therefore their approval or denial is not a broadly applicable "policy" decision.  Newby Mem. 4.  He also noted that previous EAC Executive

---

[8] Plaintiffs argue Newby's memorandum is not part of the administrative record and may not be relied upon to support his actions. Pls.' Supplemental Mem. in Supp. of Mot. for Prelim. Inj. 2 n.1, 9 n.9 [Dkt. #47].

Directors had handled requests to amend state-specific instructions "without Commissioner involvement." Newby Mem. 4. Finally, Newby stated, in essence, that his focus was on whether a voter registration application could be complete under state law without the information requested by the proposed state-specific instruction. Newby Mem. 4. He did not, however, consider whether the states "need[ed]" proof of citizenship requirements and stated such a consideration was "irrelevant to [his] analysis." Newby Mem. 4.

Plaintiffs are both individuals and organizations. The individuals Marvin and JoAnn Brown moved to Kansas from Arkansas in 2014. Compl. ¶ 14–15. They submitted Federal Forms to register to vote in Kansas and on information and belief allege they have not been registered because they did not submit documentary evidence of citizenship.[9] Compl. ¶¶ 14–15. The organizations are the League of Women Voters of the United States, the League of Women Voters of Alabama, the League of Women Voters of Georgia, the League of Women Voters of Kansas, Project Vote, the Georgia State Conference of the NAACP, and the Georgia Coalition for the People's Agenda. These organizations endeavor to assist and encourage eligible individuals to register to vote in both state and federal elections and to educate the public about the registration process for both. Compl. ¶¶ 7–13. The organizational plaintiffs maintain Newby's actions will hinder their ability "to carry out their mission of promoting voter participation through registration drives."

---

[9] Defendant-Intervenor Secretary Kobach maintains, however, that the Browns are indeed registered to vote in elections for federal office in Kansas because they submitted their Federal Forms on January 28, 2016, *before* Newby made the modifications to the Federal Form at issue here. Kobach's Mem. of P&A in Resp. to Pls.' Mot. for a Prelim. Inj. 14–15 [hereinafter "Kobach's Opp'n"] [Dkt. #51-1]; TRO Hearing Tr. 51.

Pls.' Mem. 19.  They further claim they will be forced "in all affected jurisdictions to expend substantial resources to educate the public about the new requirements." Pls.' Mem. 19.

Plaintiffs filed this lawsuit against Newby, in his official capacity as Executive Director of the EAC, and the EAC itself (collectively "defendants"), on February 12, 2016. Plaintiffs argue Newby's approval of Kansas's, Alabama's, and Georgia's requests was illegal because: (1) he did so without the approval of three commissioners; (2) he acted contrary to the commissioners' policy statement which reserves policymaking to the commissioners; (3) he did not provide formal notice or the opportunity to comment; (4) he did not explain the grounds for reversing EAC policy and precedent regarding documentation of citizenship requirements, and (5) his actions exceeded the scope of the EAC's statutory authority by adding state-specific instructions that are not "necessary." Pls.' Mem. 1–3.  On February 17, 2016, plaintiffs moved for a temporary restraining order and preliminary injunction ordering immediate reversal of Newby's changes to the Federal Form on the EAC website, ordering defendants to immediately withdraw the January 29, 2016 letters issued to Alabama, Georgia and Kansas, and requiring defendants to instruct election officials in those states to replace any copies of the Federal Form that contained the changes authorized by Newby. [10]  Pls.' Proposed Order 2.

_____

[10] At the time plaintiffs filed their Motion, the registration deadlines for the Kansas caucus and the Georgia primaries were pending. Pls.' Mem. 4.  However, Secretary Kobach explained that in Kanas, the political parties—and not the states—determine the qualifications for participation in their caucuses, TRO Hearing Tr. at 45–46, and, of course, Georgia was not enforcing its documentation of citizenship requirement. The next relevant deadline is for the Kansas primary, which will be held on August 2, 2016. Prelim. Inj. Hearing Tr. at 51 (Mar. 4, 2016) [Dkt. #96]. While registration closes twenty-one days in advance of the primary,

I set a hearing for February 22, 2016 and ordered defendants to submit any written opposition no later than 10:00 AM that day.   Scheduling Order (Feb. 18, 2016). Astonishingly, instead of submitting an opposition, defendants submitted their written *consent* to the entry of a preliminary injunction ! Defs.' Response to Pls.' Motion for TRO and Prelim. Inj. 1 [Dkt. #28].   Thereafter, I granted the Secretary of State of Kansas Kris Kobach ("Secretary Kobach") and the Public Interest Legal Foundation's ("PILF") motions to intervene as defendants and permitted them to appear at the hearing.   Minute Orders (Feb. 22, 2016).   After consideration of the parties' briefing and oral arguments, I denied plaintiffs' Motion for a Temporary Restraining Order on February 23, 2015, but reserved judgment on the propriety of a preliminary injunction.   Mem. Order [Dkt. #34]. On March 4, 2016, I again heard argument from the parties regarding the Motion for a Preliminary Injunction,[11] and the parties submitted supplemental briefing thereafter on March 21, 2016.[12]

---

would-be voters who have submitted a registration form before that date have until close of business on August 1, 2016 to provide their proof of citizenship. Prelim. Inj. Hearing. Tr. at 51.

[11] Already pending before this Court on that date were a Motion for a Preliminary and/or Permanent Injunction filed in *Grace v. District of Columbia*, Civ. No. 15-2234, and Motion for Preliminary Injunction filed in *Swanson Group Mfg. LLC v. Jewell*, Civ. No. 15-1419, and. Both of those motions presented novel, complicated, and significant issues. I issued opinions on those preliminary injunction motions on May 17, 2016 and June 28, 2016, respectively.

[12] On May 17, 2016, Judge Julie A. Robinson of the United States District Court for the District of Kansas preliminarily enjoined Secretary Kobach from enforcing Kansas's documentation of citizenship requirement "as to individuals who apply to register to vote in federal elections at the same time they apply for or renew a driver's license." *Fish v. Kobach*, No. 16-2105, 2016 WL 2866195, *32 (D. Kan. May 17, 2016), *appeal docketed* No. 16-3175 (10th Cir. June 16, 2016). Her order, which went into effect on June 14, 2016, directed Secretary Kobach to "register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide [documentary proof of citizenship]." *Id.*; *see also Fish v. Kobach*, No. 16-2105, 2016 WL 3000356, *7 (D. Kan. May 25, 2016). Plaintiffs here, however, seek to register to vote by mail using the Federal Form or to help others do so.

**STANDARD OF REVIEW**

A preliminary injunction is an "extraordinary remedy," and, as such, "should be granted only when the party seeking the relief, by a clear showing, carries the burden of persuasion." *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004). To prevail on a motion for a preliminary injunction, a plaintiff must demonstrate "that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."[13] *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted). Our Circuit has traditionally applied a "sliding scale" approach to these four factors. *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). In other words, "a strong showing on one factor could make up for a weaker showing on another." *Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011).[14] Nevertheless, "a movant must demonstrate at least some injury for a preliminary injunction to issue, for the basis of injunctive relief in the federal courts has always been irreparable harm." *Chaplaincy of Full Gospel Churches*, 454 F.3d 290, 297 (D.C. Cir. 2006) (internal citations and quotation marks

---

[13] Where, as here, a plaintiff seeks a mandatory injunction, *i.e.* an injunction that would require a positive act on the part of the defendant, certain courts have held plaintiffs to an even higher burden of persuasion. *Veitch v. Danzig*, 135 F. Supp. 2d 32, 35 n. 2 (D.D.C. 2001) (citations omitted). Our Circuit Court, however, has yet to address whether such plaintiffs must carry a heightened burden and this Court, as such, declines to impose a heightened standard of persuasion. *See, e.g., Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 834 n. 31 (D.C. Cir. 1984) ("In this circuit, however, no case seems to squarely require a heightened showing, and we express no view as to whether a heightened showing should in fact be required.").

[14] Following the Supreme Court's decision in *Winter*, our Circuit Court "has suggested, without deciding, that *Winter* should be read to abandon the sliding-scale analysis in favor of a 'more demanding burden' requiring Plaintiffs to independently demonstrate both a likelihood of success on the merits and irreparable harm." *Smith v. Henderson*, 944 F. Supp. 2d 89, 95–96 (D.D.C. 2013) (quoting *Sherley*, 644 F.3d at 392). For the time being, however, the sliding scale analysis remains the law of our Circuit.

omitted).  "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Id.*

## ANALYSIS

I.  **The State Leagues have demonstrated a substantial likelihood of standing.**

Defendant-Intervenor Secretary Kobach argues the Court lacks jurisdiction because plaintiffs have not demonstrated their standing to sue.  A federal court is, of course, a court of limited jurisdiction, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994), and is restricted to hearing and deciding actual cases or controversies, U.S. Const. art. III, § 1.  "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff bears the burden of . . . establishing the elements of standing," which are "injury in fact, causation, and redressability." *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015).  Where, as here, a plaintiff seeks injunctive relief, "he must establish an ongoing or future injury that is 'certainly impeding' and may not rest on past injury." *Id.* (quoting *Clapper v. Amnesty Int'l USA*, 133 S. Ct. 1138, 1147 (2013)).  "In reviewing the standing question, [the Court] must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." *In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) (internal quotation marks omitted).  "[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation."

*Lujan*, 504 U.S. at 561.  When moving for a preliminary injunction, a plaintiff "must show a 'substantial likelihood' of standing." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

Relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), the organizational plaintiffs maintain they have standing to sue on their own behalf based on injuries they, as organizations, have suffered.  Pls.' Mem. 27–30.  When assessing whether an organization has suffered an injury in fact, the "key issue" in this Circuit is whether the organization "has suffered a concrete and demonstrable injury to its activities." *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (internal quotation marks and alterations omitted).  For such an injury to exist, "there must . . . be a direct conflict between the defendant's conduct and the organization's mission." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1429–30 (D.C. Cir. 1996) (requiring that the "purportedly illegal action taken by the defendants was at loggerheads with and squarely countered the plaintiffs' organizational objective") (internal quotation marks omitted).  But "a mere setback to [an organization's] abstract social interests is not sufficient." *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011). In order to distinguish a concrete and demonstrable injury from a mere setback, courts in this Circuit confirm first that the defendant's allegedly illegal "action or omission to act injured the organization's interest." *PETA*, 797 F.3d at 1094 (internal quotation marks and alterations omitted); *see also Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) ("The organization must allege that discrete programmatic concerns are being directly and

adversely affected by the defendant's actions."); *Abigail All.*, 469 F.3d at 133 (differentiating "between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised"). Next the court ascertains whether "the organization used its resources to counteract that harm." *PETA*, 797 F.3d at 1094 (internal quotation marks and alterations omitted); *see also Havens Realty*, 455 U.S. at 379 (stating an organization must demonstrate a "drain on [its] resources—constitut[ing] far more than simply a setback to the organization's abstract social interests").

At minimum, the League of Women Voters of Georgia, the League of Women Voters of Kansas, the League of Women Voters of Alabama, and Project Vote (collectively "the State Leagues") have met their burden to demonstrate organizational standing.[15] They each have a mission of encouraging civic participation in both state and federal elections, which is carried out in part by assisting individuals in properly completing voter registration forms at voter registration drives. Poythress Decl. ¶¶ 4, 11 [Dkt. #13-6]; Furtado Decl. ¶¶ 4, 7, 13 [Dkt. #13-7]; Permaloff Decl. ¶¶ 6–7, 18 [Dkt. #13-8]; Slater Decl. ¶ 11 [Dkt. #13-9]. The State League's voter registration drives are often conducted at community events, on college campuses, at high schools, and in in high-traffic public places like train stations. Poythress Decl. ¶ 9; Furtado Decl. ¶ 7; Permaloff Decl. ¶ 24; Slater ¶ 9. The League of Women Voters of Kansas ("the Kansas League") explains that

---

[15] While it is conceivable Georgia State Conference of the NAACP and the Georgia Coalition for the People's Agenda could also demonstrate standing, their conclusory affidavits are devoid of the specific facts necessary to support a substantial likelihood of standing at this stage of the proceedings.

requiring documentation of citizenship adversely affects its voter registration drives because some people do not carry proof of citizenship around with them, others do not possess documentation of citizenship at all and are unable to afford it, and some individuals that do have documentation of citizenship on their person would not feel comfortable allowing voter registration volunteers to handle it.  Furtado Decl. ¶¶ 17, 20, 22, 32, 37; Krehbiel Decl. ¶¶ 5, 6 [Dkt. #47-5].  As a result, the Kansas League states, its "registration events will require more effort and will likely register fewer voters."  Furtado Decl. ¶ 32. The Kansas League further explains that, outside of its voter registration drives, it will have to expend additional resources to help applicants gather and obtain documentation of citizenship.  Furtado Decl. ¶ 32, 33, 36, 37.  But the Kansas League's efforts were, and will continue to be, undertaken largely as a general response to Kansas's documentation of citizenship requirement and its current enforcement as to all who apply to register to vote in *state* elections—rather than in response to the requirement now appearing on the Federal Form.  *See* Pls.' Mem. 19–22; Pls.' Supplemental Mem. in Supp. of Mot. for Prelim. Inj. 12–15 [Dkt. #47] Furtado Decl. ¶¶ 15–26, 36, 38, 39.   The validity of Kansas's documentation of citizenship requirement and its application in contexts outside of registration through the Federal Form are not at issue here, and the Kansas League's registration efforts will continue to be somewhat affected by the requirement regardless of the outcome of this litigation.[16]  However, the Court agrees that Newby's approval of

---

[16] Plaintiffs hint at, but do not develop, an argument that a Kansas District Court's ruling in *Belenky v. Kobach*, No. 2013CV1331 (Shawnee Cnty., Kan. Dist. Ct. Jan. 15, 2016) is relevant to their injury here because the state court concluded that the Kansas State Legislature had not authorized Secretary Kobach to limit Federal Form applicants to registration to vote only for candidates for federal—and not state—office. The Kansas District Court appears to have issued only a declaratory judgment, and the parties have not

Kansas's request *does* mean that the Kansas League will now have to help individuals understand and comply with the documentation of citizenship requirement to the extent it uses the Federal Form in its voter registration endeavors.  Furtado Decl. ¶¶ 28–29.

The League of Women Voters of Alabama, the League of Women Voters of Georgia, and Project Vote, which operates in Georgia, submitted similar declarations regarding how documentation of citizenship requirements could impede their voter registration drives, but their situation is different from that of the Kansas League because the record indicates that Alabama and Georgia, unlike Kansas, are *not* actually enforcing their respective documentation of citizenship requirements as to Federal Form applicants. As such, the Alabama and Georgia state leagues merely provide conclusory claims that as long as the state-specific instructions remain on the Federal Form their voter registration activities will be hindered.  Permaloff Decl. II ¶ 11 [Dkt. #47-6]; Poythress Decl. II ¶¶ 11–13 [Dkt. #47-7].  Curiously, they fail to explain how this can be so when they could simply inform the voter registration applicants they assist that the requirement is not being enforced.

However, each of the State Leagues also has a mission of educating the public about voting laws, which is closely tied to their mission of encouraging civic participation. Poythress Decl. ¶ 19; Furtado Decl. ¶ 4; Permaloff Decl. ¶ 31–32; Slater ¶ 25.  If the state-specific instructions remain on the Federal Form, the State Leagues will have to expend

---

demonstrated to this Court that the *Belenky* case has had or will have any effects on how Kansas will administer registration for state and federal elections.  Instead, plaintiffs merely state *Belenky* has generated confusion in Kansas.  Prelim. Inj. Hearing Tr. 33–34.  Moreover, Secretary Kobach maintains he is pursuing an appeal of the Kansas District Court's decision.  TRO Hearing Tr. 72–74.

some resources to clarify the effects of the requirements to their members and volunteers and to potential voters they encounter in order to minimize confusion the instructions may cause. Poythress ¶ 19; Furtado Decl. ¶ 41; Permaloff ¶ 31, 35 Slater ¶¶ 8, 25–29. Because they will be expending resources "in response to, and to counteract, the effects of the defendants' alleged[ly unlawful conduct]," *Equal Rights Ctr.*, 633 F.3d at 1140, the State Leagues have demonstrated a substantial likelihood of organizational standing.[17]

## II.   Newby's actions are subject to judicial review.

Defendant-intervenors argue that Newby's actions are not subject to judicial review under the APA, implying they are "general statements of policy." Kobach's Opp'n 19 (quoting *Center for Auto Safety v. NHTSA*, 452 F.3d 798, 806–07 (D.C. Cir. 2006)); *see also* Public Interest Legal Foundation's Mem. of P&A in Resp. to Pls.' Mot. for a TRO and a Prelim. Inj. 8–9 [Dkt. #53]. The APA provides a "limited cause of action for parties adversely affected by agency action." *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 185 (D.C. Cir. 2006). Pursuant to Section 704 of the APA, "final agency action for which there is no other adequate remedy in a court [is] subject to judicial review." 5 U.S.C. § 704. "[T]o be 'final,' agency action must 'mark the consummation of the agency's decisionmaking process,' and must either determine 'rights or obligations' or occasion 'legal consequences.'" *Alaska Dep't of Envtl. Conservation v. EPA*, 540 U.S. 461, 483 (2004) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)). If there is no final agency

---

[17] Having concluded at least one plaintiff from each state at issue has demonstrated standing, it is unnecessary to analyze the other plaintiffs' standing. *See Ry. Labor Executives' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case."). Nor does the Court reach the organizations' arguments that they have standing to sue on behalf of their individual members.

action at issue, a plaintiff "lack[s] a cause of action under the APA." *Trudeau*, 456 F.3d at

185 (quoting *Reliable Automatic Sprinkler Co. v. Consumer Prod. Safety Comm'n*, 324

F.3d 726, 731 (D.C. Cir. 2003)).  As our Circuit Court has explained, a policy statement or

an interpretive rule is not final agency action—and therefore is unreviewable under the

APA—because it "does not establish a binding norm and is not finally determinative of the

issues or rights to which it is addressed." *Nat'l Envtl. Dev. Assoc.'s Clean Air Project v.

EPA*, 752 F.3d 999, 1007 (D.C. Cir. 2014) (quoting Edwards, Elliott, & Levy, *Federal

Standards of Review* 157 (2d ed. 2013)).

Newby's grants of Alabama's, Georgia's, and Kansas's requests constitute final

agency action.  Newby's actions clearly ended any decisionmaking process at the EAC as

to whether the States' documentation of citizenship requirements should be included on

the Federal Form.  Indeed, the Federal Form was immediately revised to include the newly

approved instructions.   Moreover, the State of Kansas promptly began enforcing its

documentation of citizenship requirement as to Federal Form applicants, demonstrating

that Newby's actions had immediate legal consequences.  Finally, although Secretary

Kobach suggests that the Commissioners themselves may reconsider Newby's decisions,

"[t]he mere possibility that an agency might reconsider . . . does not suffice to make

otherwise final agency action nonfinal." *Sackett v. EPA*, 132 S. Ct. 1367, 1372 (2012); *cf.

Appalachian Power Co. v. EPA*, 208 F.3d 1015, 1022 (D.C. Cir. 2000) ("[A]ll laws are

subject to change . . . .  The fact that a law may be altered in the future has nothing to do

with whether it is subject to judicial review at the moment." (citation omitted)).

Secretary Kobach's final threshold argument is that plaintiffs have failed to exhaust their administrative remedies by not pursuing an appeal of Newby's actions to the Commissioners. *See* TRO Hearing Tr. at 57; Kobach's Opp'n 17. But Secretary Kobach does not cite any rule or statute mandating that a plaintiff seek commissioner review of actions taken by the Executive Director before pursuing judicial review, and the APA itself "imposes no prerequisite of administrative exhaustion unless it is 'expressly required by statute or agency rule.'" *United States v. Hughes*, 813 F.3d 1007, 1010 (D.C. Cir. 2016) (quoting *Darby v. Cisneros*, 509 U.S. 137, 143 (1993)). Accordingly, judicial review is proper here even if plaintiffs did not seek further review at the agency level.

## III. Plaintiffs have not demonstrated they will be irreparably injured absent injunctive relief.

To say the least, irreparable harm is the cornerstone of injunctive relief. Our Circuit Court has set a "high standard for irreparable injury," requiring the movant's injury to first "be both certain and great" and second be "beyond remediation." *Id.* Indeed, our Circuit Court has explained that "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough." *Wisc. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985). Instead, "[t]he possibility that adequate compensatory of other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm." *Id.* The burden, of course, is on the movant to demonstrate that he has suffered such a harm and a "movant's failure to show any irreparable harm is [] grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief."

*Chaplaincy of Full Gospel Churches*, 454 F.3d at 297 (internal citations and quotation marks omitted). Unfortunately for the plaintiffs, they have failed to do so here. How so?

The organizational plaintiffs argue that they and their members will be irreparably harmed absent injunctive relief because their voter registration drives will be less successful and require more effort, they will expend efforts on educating the public about the changes to the state-specific instructions, and many eligible citizens—including some of the organizational plaintiff's members—will be unable to register to vote.[18] I disagree. The modification of the Federal Form to include the state-specific documentation of citizenship requirements, although an inconvenience, in no way *precludes* the organizational plaintiffs and their members from conducting their core activities of encouraging civic participation in both state and federal elections and educating the public about the requirements for registering to vote in each. Moreover, as discussed above, injuries to voter registration drive efforts are far from certain in Alabama and Georgia where, on the record before me, the documentation of citizenship requirements are not even being enforced.

As for Kansas, the organizational plaintiffs and their members are focused on registering eligible citizens to vote in both federal and *state* elections. *See* Prelim. Inj. Hearing Tr. 34–35. Regardless of the outcome of this litigation they will have to endeavor to help eligible citizens understand and comply with the documentation of citizenship

---

[18] Because the individual plaintiffs Joann and Marvin Brown have not contested that they submitted their Federal Form applications before Newby modified the form to include Kansas's documentation of citizenship requirement and that Kansas accordingly approved their Federal Form applications, they have not demonstrated any injury—irreparable or otherwise stemming from the administrative actions at issue in this case.

requirement in order to be certain those citizens are registered to vote in Kansas's state elections. Since successfully registering citizens to vote at the state level automatically qualifies them to vote in the federal election, Prelim. Inj. Hearing Tr. 35, the organizations' ongoing efforts during this litigation to register more voters for statewide elections will have a dual benefit inconsistent with their alleged harm. And to the extent these inconveniences and added resources are injuries, they are not actually irreparable. As Secretary Kobach explains, if the state-specific instruction remains on the Federal Form as this litigation proceeds and plaintiffs are ultimately successful on the merits, the State of Kansas will retroactively register for federal elections any Federal Form applicants who had not been approved solely because they failed to provide documentation of citizenship. Kobach's Opp'n 13–14. The organizational plaintiffs and their members will undoubtedly have to expend some additional time and effort to help individuals, including some of their own members,[19] understand the meaning and effect of the instructions on the Federal Form and, in Kansas, to comply with the documentation of citizenship requirement when registering using the Federal Form.[20] *See* Johnson Decl. ¶ 9; Butler Decl. ¶ 9; Poythress Decl. ¶ 20; Permaloff Decl. ¶ 35; Slater Decl. ¶¶ 25, 27. But let's be candid: doing so pales

---

[19] While the organizational plaintiffs maintain some of their members "are being prevented or discouraged from registering because of [Newby's] actions," Pls.' Supplemental Mem. in Supp. of Mot. for Prelim. Inj. 12 [Dkt. #47], the only example they provide is of a member of the Kansas League who "faced significant difficulties registering to vote in Kansas" but was ultimately able to do so. Krehbiel Decl. ¶¶ 7–8.

[20] Although the organizational plaintiffs maintain they will have to cancel some voter registration drives due to their members and volunteers' reluctance to handle and photocopy other individuals' documentation of citizenship, *see, e.g.,* Furtado Decl. ¶ 37, in the absence of evidence that doing so would be illegal, the Court sees those harms as self-inflicted. *See Safari Club Int'l v. Salazar*, 852 F. Supp. 2d 102, 123 (D.D.C. 2012) ("It is well-settled that a preliminary injunction movant does not satisfy the irreparable harm criterion when the alleged harm is self-inflicted.") (internal quotation marks omitted). After all, mustering the proof of citizenship documents to register to vote is probably no more difficult than it would be to satisfy the citizenship requirements necessary to obtain a U.S. passport to travel abroad.

in comparison to explaining to the average citizen how the ACA or tax code works !  As such, the "time and energy necessarily expended in the absence of injunctive relief are not enough" to constitute an irreparable harm warranting a preliminary injunction, especially considering the potential for sufficient relief in the future. *Wisc. Gas Co.*, 758 F.2d at 674. Thus, because plaintiffs have failed to demonstrate they will be irreparably harmed absent injunctive relief, they have not met their burden of showing their entitlement to a preliminary injunction.[21]  *See GEO Specialty Chem., Inc. v. Husisian*, 923 F. Supp. 2d 143, 147 (D.D.C. 2013) ("[A] court may refuse to issue an injunction without considering any other factors when irreparable harm is not demonstrated.").

## IV.    The relief plaintiffs seek is inappropriate at this preliminary stage.

Issuance of a preliminary injunction is always "an extraordinary remedy." *Winter*, 555 U.S. at 24.  That said, the breadth of the preliminary injunction plaintiffs seek here is truly astonishing.  They do not ask the Court simply to enjoin the EAC from *enforcing*

---

[21] Plaintiffs' arguments regarding their education efforts do not fare better.  The Kansas League merely speculates that it "will likely spend thousands of dollars on producing and distributing additional instructional videos." Furtado Decl. ¶ 39.  To say the least, this injury is far from "certain." *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  Further, the Kansas League states one of its paid interns "will spend additional time . . . planning ways to educate voters and solve problems created by the documentary proof of citizenship requirement." Furtado Decl. ¶ 39.  While this injury may be sufficient in the standing analysis, it is nowhere close to the threshold of a "great" injury required for the issuance of a preliminary injunction. *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297.  The same goes in spades for the League of Women Voters of the United States's declaration that it will have to update its website in response to Newby's actions.  Leonard Decl. ¶ 24.  And to the extent the organizational plaintiffs' declarants suggest that the organizations will incur monetary losses through their efforts related to the state-specific instructions on the Federal Form, the declarations are devoid of specifics necessary for the Court to evaluate whether such pecuniary losses constitute irreparable harm under the law of this Circuit. *See* Leonard Decl. ¶ 24; Johnson Decl. ¶ 9; Butler ¶ 9; Gaddy Decl. ¶ 18; Poythress Decl. ¶ 20; Furtado ¶ 39; Permaloff ¶ 34. Even when economic harm cannot be recovered through litigation, a plaintiff must still demonstrate it is "serious in terms of its effect on the plaintiff." *Hi–Tech Pharmacal Co. v. FDA*, 587 F. Supp. 2d 1, 11 (D.D.C. 2008).  Without any specifics as to the costs plaintiffs will incur and their relation to the organizations' budgets as a whole, the Court cannot conclude plaintiffs are clearly entitled to injunctive relief.

Newby's decisions, which could conceivably include an order requiring the EAC to temporarily amend the Federal Form on the EAC's website and direct Alabama, Georgia, and Kansas to accept and use the amended version during the pendency of this litigation. Instead, they want this Court to *void* and *vacate* Newby's actions and order the EAC to *reverse* the changes to the Federal Form and *withdraw* Newby's letters granting the States' requests. Pls.' Proposed Order 1–2. These demands are dramatized all the more by the fact the United States Department of Justice has somehow decided to *consent* to such remarkable relief ! Defs.' Proposed Order [Dkt. #28-3]. To say the least, this is not the stuff of a typical preliminary injunction; indeed, it is, in effect, a thinly veiled request for the relief normally accorded in a final judgment.[22] *See, e.g.*, *United States Ass'n of Reptile Keepers, Inc. v. Jewell*, 106 F. Supp. 3d 125, 126 (D.D.C. 2015) ("[W]hen a court issues a preliminary injunction, it acts to preserve the parties' respective rights and interests while the case is pending, and it does not typically declare the challenged rule unlawful or vacate the rule."). Prudence, alone, therefore dictates against granting such comprehensive relief masquerading as a preliminary injunction.

To put it mildly, there are extremely important competing interests at stake in this case. On the one hand, states are seeking to enforce their voting requirements, and, as the Supreme Court has recognized, the states' authority under the Constitution "to establish

---

[22] And even were plaintiffs to prevail on their argument that Newby's explanation for his actions was inadequate under the APA, in this Circuit, "[a]n inadequately supported rule . . . need not necessarily be vacated." *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150 (D.C. Cir. 1993). Instead, the Court's consideration of whether to vacate and remand or to remand without vacating would turn on "the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed." *Id.* 150–51 (quoting *Int'l Union, UMW v. FMSHA*, 920 F.2d 960, 967 (D.C. Cir. 1990)).

voting requirements is of little value without the power to enforce those requirements." *ITCA*, 133 S. Ct. at 2258.   On the other hand, Congress has exercised and delegated its constitutional authority to regulate "the Times, Places and Manner of holding" congressional elections, U.S. Const. art. I, § 4, cl. 1, which includes some power to issue "regulations relating to registration," *ITCA*, 133 S. Ct. at 2253 (internal quotation marks omitted).   But, in the final analysis, what lies at the heart of this case are the scope of the authority and the legality of the actions of an *independent* federal agency that is represented here by Executive Branch counsel who, for the most part, decline to defend it.   The Court will carefully weigh these competing positions on the merits when it turns to the dispositive motions phase of this litigation in the weeks ahead.   But for now, for all the foregoing reasons, the Court DENIES plaintiffs' Motion for a Preliminary Injunction.   An Order consistent with this Memorandum Opinion is issued separately on this same date.


RICHARD J. LEON
United States District Judge