UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Case No. 16-236 (RJL) |
| BRIAN D. NEWBY, in his capacity as the Executive Director of the United States Election Assistance Commission, and UNITED STATES ELECTION ASSISTANCE COMMISSION, | ) ) ) ) ) ) | |
| Defendants, | ) ) | |
| KANSAS SECRETARY OF STATE KRIS W. KOBACH and PUBLIC INTEREST LEGAL FOUNDATION, | ) ) ) ) | |
| Defendant-Intervenors. | ) | |

**FILED**

**FEB 2 4 2017**

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

MEMORANDUM OPINION

(February 24, 2017)

Plaintiffs bring this action against defendants alleging that the Executive Director of the United States Election Assistance Commission ("EAC" or "Commission"), Brian Newby, acted outside of his authority and in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–706, when he granted Kansas's, Georgia's, and Alabama's requests to modify the instructions on the National Mail Voter Registration Form ("the Federal Form") to direct voter registration applicants in those three States to submit documentary proof of their United States citizenship in accordance with the States'

respective laws and regulations.  Pending before the Court are the parties' cross-motions for summary judgment.  Upon careful consideration of the parties' motions, oppositions, replies, and oral arguments, the briefs of amici curiae Landmark Legal Foundation and Eagle Forum Education & Legal Defense Fund, the relevant law, and the entire record, the Court REMANDS the challenged determinations to the Commission for the limited purpose of providing an interpretation of its internal directive which is necessary for resolution of the threshold issue of whether Newby acted within his subdelegated authority.

## BACKGROUND

The background of this case was set forth in detail during the preliminary injunction phase by our Court of Appeals and by this Court.  *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 4–6 (D.C. Cir. 2016); *League of Women Voters of the United States v. Newby*, 195 F. Supp. 3d 80, 83–88 (D.D.C. 2016).  The Court will therefore limit its present statement of the facts and law to only that necessary for the present disposition. In the National Voter Registration Act of 1993 ("NVRA"), Congress directed the Federal Election Commission ("FEC"), "in consultation with the chief election officers of the States," to create a single federal voter registration form that "[e]ach State shall accept and use" to register voters for elections for federal office via mail.  52 U.S.C. §§ 20501(b)(1); 20505(a)(1); 20508(a)(1).  That form is known colloquially as the "Federal Form."  Would-be voters fill out the application portion of the Federal Form, which is attached to both general instructions for all applicants and a state-by-state guide that includes state-specific instructions "which tell residents of each State what additional information they must provide and where they must submit the form."  *Arizona v. Inter Tribal Council of Arizona,*

*Inc.*, 133 S. Ct. 2247, 2252 (2013). "Each state-specific instruction must be approved by the EAC before it is included on the Federal Form." *Id.* Congress established the EAC through the Help America Vote Act of 2002 ("HAVA"). 52 U.S.C. § 20921. The HAVA specifies that the "Commission shall have four members appointed by the President, by and with the advice and consent of the Senate." *Id.* § 20923(a)(1). The HAVA transferred authority over the Federal Form from the FEC to the newly formed EAC. *Id.* §§ 20508, 20929. The HAVA specifies that "[a]ny action which the Commission is authorized to carry out under [the HAVA] may be carried out only with the approval of at least three of its members." 52 U.S.C. § 20928. The NVRA, the HAVA, and the associated regulations do not, however, set forth a particular process for EAC review of States' requests to modify their respective state-specific instructions on the Federal Form. As such, I will hereinafter refer to such requests as "state instruction requests."

On January 29, 2016, the EAC's Executive Director Brian Newby granted Kansas's, Alabama's, and Georgia's state instruction requests to include instructions regarding their respective laws requiring voter registration applicants to prove their citizenship, either through documentary proof or alternative processes. AR0063–64; AR0070–71; AR0109–110. Newby was the decisionmaker; the three sitting Commissioners did not formally consider or vote upon the States' requests. The approved modifications to the state-specific instructions were promptly inputted, and a new version of the Federal Form was posted on the EAC website. Newby's approval letters were matter of fact and did not contain any explanation as to how he reached his decisions. He did, however, provide an explanation in a roughly contemporaneous internal memorandum dated February 1, 2016. AR0001–

07. Newby explained that several state instruction requests were awaiting review when he became Executive Director in November 2015. AR0001. Feeling a sense of urgency given the upcoming presidential elections, Newby stated that he worked quickly to develop a process for considering and ultimately resolving the requests. AR0001–02. He considered "[s]tate-specific instructional changes [to be] ministerial, and thus, routine," and concluded therefore that "[t]he Executive Director [was to] review the request [only] for clarity and accuracy." AR0002. Newby also explained that—in his view—review of proposed state-specific instructions was not a "policy" function that would require the Commissioners' approval under their February 24, 2015 "Election Assistance Commission Organizational Management Policy Statement," which set forth in general terms the respective responsibilities of the Commissioners and the EAC's Executive Director and which will be discussed in more detail below. AR0004; *see also* AR0226–29. Unlike changes to the Federal Form's general application page, Newby stated, alterations to state-specific instructions impact only applicants in the State to which they apply, and therefore their approval or denial is not a broadly applicable "policy" decision. AR0004. He also noted that previous EAC executive directors had handled requests to amend state-specific instructions "without Commissioner involvement." AR0004. Finally, Newby stated, in essence, that his focus was on whether a voter could become registered under state law without the information requested by the proposed state-specific instruction. AR0004. He did not, however, consider whether the states "need[ed]" documentary proof of citizenship to enforce their qualifications that registered voters be citizens and stated such a consideration was "irrelevant to [his] analysis." AR0004.

4

Plaintiffs filed this lawsuit against Newby, in his official capacity as Executive Director of the EAC, and the EAC itself (collectively "defendants"), on February 12, 2016.[1] Their Complaint alleges five counts: (1) that pursuant to Section 208 of the HAVA Alabama's, Georgia's, and Kansas's requests could be granted, if at all, only by approval of three Commissioners and thus Newby's grant of the request exceeded his statutory authority in violation of the APA, Compl. ¶¶ 70–74; (2) that Newby's grant of Alabama's, Georgia's, and Kansas's requests constituted a reversal of the Commission's policy as to documentation of citizenship requirements and that he therefore exceeded the scope of his authority as set forth in the 2015 Policy Statement; Compl. ¶¶ 75–78; (3) that, because in plaintiffs' view granting the States' requests marked a reversal of Commission policy, Newby was required by the APA to first undergo notice and comment rulemaking, which he did not, Compl. ¶¶ 83–86; (4) that Newby's failure to provide an explanation of the bases for his decision to depart from what plaintiffs claim to be "longstanding policy and legal determination that documentary proof of citizenship was not 'necessary' within the meaning of the NVRA" was contrary to the APA's requirements for reasoned decision making, Compl. ¶¶ 87–91; and (5) that Newby's failure to determine that the States'

---

[1] Defendant-intervenor the Public Interest Legal Foundation challenges plaintiffs' standing. Def.-Intervenor PILF's Cross-Mot. for Summ. J. 11–15 [Dkt. #105]. Because the Court's present Opinion does not rule on the merits of plaintiffs' claims, the Court "defers ruling on its jurisdiction to decide those claims." *In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 748 F. Supp. 2d 19, 22 n.5 (D.D.C. 2010) (citing *Warth v. Seldin*, 422 U.S. 490, 498 (1975) ("In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues.")). For now, the Court will merely note that it has already held that at least one organizational plaintiff from Alabama, Georgia, and Kansas has demonstrated a substantial likelihood of standing. *League of Women Voters of the United States v. Newby*, 195 F. Supp. 3d 80, 92 (D.D.C. 2016); *see also League of Women Voters of United States v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (stating the organizational plaintiffs have demonstrated the injury prong of standing).

documentation of citizenship requirements are "necessary" under the NVRA before granting their requests was contrary to the APA's requirements for reasoned decision making, Compl. ¶¶ 92–96.

On February 17, 2016, plaintiffs moved for a temporary restraining order and preliminary injunction ordering immediate reversal of Newby's changes to the Federal Form on the Commission's website, ordering defendants to immediately withdraw the January 29, 2016 letters issued to Alabama, Georgia and Kansas, and requiring defendants to instruct election officials in those States to replace any copies of the Federal Form that contained the changes authorized by Newby.  On February 22, I granted Kansas Secretary of State Kris W. Kobach's and the Public Interest Legal Foundation's ("PILF") motions to intervene as defendants.  I then denied plaintiffs' motion as to the request for a temporary restraining order on February 23, 2016, Mem. Order [Dkt. #34], and as to the request for a preliminary injunction on June 29, 2016, Mem. Op. and Order [Dkts. ##92, 93].  Plaintiffs promptly appealed to the Court of Appeals for the District of Columbia Circuit.  Notice of Appeal (July 1, 2016) [Dkt. #95].  Argument was heard by that Court on September 8, 2016, and the next day it issued a judgment granting a preliminary injunction forbidding the Commission or anyone acting on its behalf from giving effect to Newby's decisions to grant the relevant requests, and requiring the Commission to "take all actions necessary to restore the status quo ante, pending a determination on the merits." *League of Women Voters v. Newby*, No. 16-cv-5196, 2016 WL 4729502, at *1 (D.C. Cir. Sept. 9, 2016).  Such steps included "promptly removing" the challenged instructions from the Federal Form and "informing Kansas, Alabama, and Georgia that Federal Form applications filed since

January 29, 2016 should be treated as if they did not contain the now-stricken state-specific instructions." *Id.* Our Circuit Court then issued an opinion explaining its decision more fully on September 26, 2016. *League of Women Voters of United States v. Newby*, 838 F.3d 1 (D.C. Cir. 2016).

During the pendency of the appeal, the parties went forth with filing and briefing their respective motions for summary judgment.[2] Plaintiffs move for summary judgment in their favor on all five counts of the Complaint. Pls.' Cross-Mot. for Summ. J. [hereinafter "Pls.' Mem."] [Dkt. #103]. Defendants, represented by the Department of Justice's Federal Programs Branch, concede that, at minimum, Newby failed to apply the correct statutory standard in reaching his decision and thereby violated the APA. Defs.' Mot. for Summ. J. 14–20 [hereinafter "Defs.' Mot."] [Dkt. #101]. Defendants state the

---

[2]     As this litigation has been pending, so has a challenge to Kansas's enforcement of its documentary proof of citizenship requirement "as to individuals who apply to register to vote in federal elections at the same time they apply for or renew a driver's license." *Fish v. Kobach*, 189 F. Supp. 3d 1107, 1152 (D. Kan. 2016). In that challenge, United States District Judge Julie Robinson issued a preliminary injunction directing Secretary Kobach to "register for federal elections all otherwise eligible motor voter registration applicants that have been cancelled or are in suspense due solely to their failure to provide [documentary proof of citizenship]." *Id.*; *see also Fish v. Kobach*, No. 16-cv-2105, 2016 WL 3000356, at *7 (D. Kan. May 25, 2016). The Court of Appeals for the Tenth Circuit affirmed the District Court's grant of the preliminary injunction in a judgment issued September 30, 2016. *Fish v. Kobach*, No. 16-cv-3147, 2016 WL 5791539, at *1 (10th Cir. Sept. 30, 2016); *see also Fish v. Kobach*, 840 F.3d 710 (10th Cir. 2016) (opinion supporting judgment). Of relevance to this case, the parties in *Fish* filed a Joint Status Report on September 29, 2016. They reported to Judge Robinson that they had reached an Interim Agreement regarding Kansas's administration of the November 8, 2016 election. Joint Status Report, *Fish v. Kobach*, No. 16-2105 (D. Kan. Sept. 29, 2016), ECF No. 225. Under the terms of the Interim Agreement, Secretary Kobach was to notify "otherwise eligible motor voter registration and Federal Form applicants that have been cancelled or are in suspense due solely to their failure to provide documentary proof of citizenship" that they were "deemed registered and qualified to vote for the appropriate local, state, and federal elections for purposes of the November 8, 2016 general election, subject only to further official notice." *Id.* 1–2. This interim agreement was therefore consistent with the preliminary injunction in place in this case. This Court held oral argument on the parties' motions for summary judgment on October 13, 2016. At that time, the parties were in agreement that the practical reality was that little, if anything, could be done in this case to affect registration for the November 8, 2016 election. Accordingly, it was the parties' view that there was no need for the Court to issue an opinion prior to the election.

proper remedy is to set aside the challenged actions on that narrow ground and to reserve judgment on any other issue presented in this case. *Id.* at 21–25. Defendant-intervenors argue that, particularly when viewed in light of what they perceive to be serious constitutional questions that would be raised were the Commission ordered to revoke Newby's grant of the States' requests, Newby's actions were lawful and that plaintiffs therefore are not entitled to summary judgment on any count. Def.-Intervenor PILF's Cross-Mot. for Summ. J. 17–32 [hereinafter "PILF's Mem."] [Dkt. #105]; Def.-Intervenor Kobach's Mem. of P. & A. in Supp. of his Cross-Mot. for Summ. J. [hereinafter "Kobach's Mem."] [Dkt. #107].

## DISCUSSION

It would be an understatement to say that the parties' briefing presents difficult questions. In urging the Court to impart a narrow ruling on summary judgment that would thread the proverbial needle by reaching only Counts IV and V of plaintiffs' Complaint, the Department of Justice has recalled the sage words of Justice Frankfurter: "These are perplexing questions. Their difficulty admonishes [the Court] to observe the wise limitations on [its] function and to confine [itself] to deciding only what is necessary to the disposition of the immediate case." *Whitehouse v. Illinois Central R. Co.*, 349 U.S. 366, 372–73 (1955). I wholeheartedly agree, but in my view it is Counts I and II, which address the Executive Director's authority to rule upon the States' requests, that present the true opportunity for a narrow disposition. After all, these are threshold questions and are potentially dispositive. If Newby's actions were *ultra vires*, they must be set aside, and it matters not whether his reasoning can withstand APA review. To say the least, it would

not be prudent for this Court to make rulings regarding the thorny statutory and constitutional questions presented in the parties' briefing regarding Counts III and IV if its ruling in Counts I or II dictate that, either under the HAVA, administrative law principles, or the Commission's 2015 Policy Statement, the Commissioners, and not the Executive Director, are to rule upon state instruction requests.

Thus, in evaluating the cross-motions for summary judgment, the first issue for the Court is whether, as plaintiffs claim, the EAC may rule upon States' requests only through a vote of the Commissioners. *See* Pls.' Mem. 20–22 (relying on 52 U.S.C. § 20928, which states that "[a]ny action which the Commission is authorized to carry out under [the HAVA] may be carried out only with the approval of at least three of its members"). Assuming, without deciding, that the Commissioners *may* subdelegate their authority to grant or deny States' requests for modification of their state-specific instructions on the Federal Form to the Executive Director, the next question for the Court will be whether they did so. The Administrative Procedure Act compels courts to "hold unlawful and set aside agency action, findings, and conclusions" if they are "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C). A corollary of this directive is that courts reviewing agency action must determine that "the particular official acting on behalf of the agency [was] delegated the authority to act; otherwise such agency action is invalid." *Am. Vanguard Corp. v. Jackson*, 803 F. Supp. 2d 8, 12 (D.D.C. 2011). When faced with the question of whether a particular agency official was subdelegated authority to act, courts in this Circuit examine the record, the relevant statute, and the implementing regulations to discern whether subdelegation

occurred. *See Ctr. for Auto Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 810 (D.C. Cir. 2006); *Town of E. Hartford v. Harris*, 648 F.2d 4, 6 (D.C. Cir. 1980).[3]

I will thus begin by evaluating the record's evidence as to any subdelegation of the authority to rule upon States' requests to modify their state-specific instructions. The record here reveals that there has been no consistent or longstanding practice as to the Executive Director's authority to grant or deny state instruction requests. In the early days of the Federal Form, the FEC made changes to state-specific instructions by a vote of the Commissioners. AR0163; AR0204. In August 2000, the FEC shifted gears and modified its procedure to provide that the staff of its Office of Election Administration would be responsible for making any changes to state-specific instructions. AR0163; AR0204. Under the new procedure, however, FEC Commissioners would continue to vote on any changes to the Federal Form that were applicable to more than one State. AR0163. When Congress transferred responsibility over the Federal Form to the EAC, the Commission's Associate General Counsel and Executive Director were initially responsible for approving

---

[3]     Plaintiffs argue that "[i]t is a long-settled principle that absent express and explicit delegation, a subdelegatee does not have authority to act." Pls.' Mem. 23. They rely on *Greene v. McElroy*, 360 U.S. 474, 506–07 (1959). That case discusses delegation from Congress or the President to agencies in areas of "questionable constitutionality." *Id.*; *see also id.* at 507 ("Without explicit action by lawmakers, decisions of great constitutional import and effect would be relegated by default to administrators who, under our system of government, are not endowed with authority to decide them."); *United States v. Dockery*, 447 F.2d 1178, 1192 (D.C. Cir. 1971) (describing the *Greene* Court's approach as narrowly interpreting the relevant delegation in order to avoid a constitutional issue). *Greene* does not address intra-agency subdelegations of authority that has been delegated by statute to the agency heads. *Cf. U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 565 (D.C. Cir. 2004) (explaining that intra-agency subdelegations are "presumptively permissible absent affirmative evidence of a contrary congressional intent"). Without binding precedent the Court will not impose a standard that requires clear and explicit subdelegations in all instances, as such a standard could hamper the functionality of federal agencies as they carry out their duties.

and denying state instruction requests. *See* AR0230–32, AR0233–35. This practice, however, does not appear to have been memorialized in any written procedure.

On March 6, 2006, pursuant to that arrangement, the Executive Director rejected Arizona's request to include its documentary proof of citizenship requirement in its state-specific instructions. AR0233–35. Four months later, in light of ensuing litigation and voter confusion in Arizona, the Commissioners departed from the practice of staff management of state instruction requests and conducted a vote amongst themselves as to whether to include Arizona's proposed instruction. AR0261–62. The vote was 2-2, which meant the instruction was not approved. AR0245–50. In the years that followed, the Commissioners discussed on several occasions the lack of procedure for dealing with state instruction requests, and they considered several options for structuring the process and allocating duties among the Commissioners and the Executive Director. AR0375–76; AR0530–32; AR0700; AR0711–19; *see also* AR0732–78. For example, under one proposal the Executive Director would have implemented a state instruction request if it was a request to "update" its state-specific instructions, meaning "bring up to date information that (1) is presently contained on the state specific instructions of the Federal Form, and (2) is information required by and consistent with Federal statute." AR0776–77 (describing requests regarding state voter eligibility requirements, state contact information, state voter registration deadlines, and voter identification numbers as "updates"). However, if the posed request was not an "update," the Executive Director would have forwarded it to the Commissioners for action. AR0778. The Commissioners also considered adopting the procedure the FEC had used under which staff approved and rejected state instruction requests and the Commissioners

voted on Federal Form items that affect more than one State.   AR0767.   But the Commissioners were ultimately unable to adopt any policies or procedures. Thus, on March 20, 2008, Commissioner Hillman recommended that the Commissioners themselves conduct *ad hoc* votes on the requests pending at that time. AR0793–94. The Commissioners agreed to adopt this new practice and then voted unanimously to approve seven state instruction requests, and they again deadlocked as to a request from Arizona to include its documentary proof of citizenship requirement. AR0793–96.

On September 12, 2008, the Commissioners adopted a document entitled "Roles and Responsibilities of the Commissioners and Executive Director of the U.S. Election Assistance Commission," which "identif[ied] the specific roles and responsibilities of the . . . Executive Director and [the] four Commissioners." AR0209–16; *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1190 (10th Cir. 2014). The document stated that the Executive Director was "expected to (1) prepare policy for commissioner approval, (2) implement policies once made, and (3) take responsibility for administrative matters." AR0209. Moreover, the Executive Director was to "[p]rovide for the overall direction and administration of EAC's operating units and programs, consistent with the agency's strategic plan and any . . . commissioner adopted policies," and "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies." AR0215. The document further provided that the Commissioners would "not directly act" on matters that they had delegated to the Executive Director. AR0216.

Importantly, immediately following the adoption of the 2008 Roles and Responsibilities document, the Commissioners themselves continued to vote on all state

instruction requests. AR0217, AR219–20. Indeed, from 2008 to 2010 *every* decision on state instruction requests was made through a vote of the Commissioners. AR0217, AR0219–20. However, at the end of 2010, the Commission found itself with only two Commissioners, and thus, its quorum was lost. Executive Director Thomas Wilkey instituted an interim procedure under which the Executive Director, after consultation with the General Counsel and other Commission staff, would generally make determinations regarding state instruction requests but that any "[r]equests that raise[d] issues of broad policy concern to more than one State w[ould] be deferred until the re-establishment of a quorum." AR0217–18. Wilkey asserted that the interim procedure was consistent with the Commission's past precedent, in that, prior to 2008, the practice had been for staff to approve or deny state instruction requests. AR0218. Pursuant to Wilkey's memorandum, EAC staff made determinations regarding state instruction requests from 2011 to 2014, including Executive Director Alice Miller's 2014 denial of Arizona's, Georgia's, Kansas's requests to include instructions regarding their documentary proof of citizenship requirements. AR0220–25; AR0283–328. In subsequent litigation, the Court of Appeals for the Tenth Circuit found the Executive Director to be acting within her subdelegated authority under the 2008 Roles and Responsibilities document. *Kobach*, 772 F.3d at 1191–92.

When the Commission regained a quorum in early 2015, the three newly minted Commissioners adopted via unanimous vote an "Organizational Management Policy Statement." AR0226–229; AR0857–861. The 2015 Policy Statement expressly superseded the 2008 Roles and Responsibilities document. AR0226. However, the two documents bear striking similarities. As to the "[d]ivision of authority regarding

policymaking and day-to-day operations," the 2015 Policy Statement provides that "[t]he Commissioners shall make and take action in areas of policy." AR0227. Further, "[p]olicymaking is a determination setting an overall agency mission, goals and objectives, or otherwise setting rules, guidance or guidelines. Policymakers set organizational purpose and structure, or the ends the agency seeks to achieve. The EAC makes policy through the formal voting process." AR0227. Finally, "[t]he Executive Director in consultation with the Commissioners is expected to: (1) prepare policy recommendations for commissioner approval, (2) implement policies once made, and (3) take responsibility for administrative matters. The Executive Director may carry out these responsibilities by delegating matters to staff." AR0227. Notably, however, the 2015 Policy Statement did not delegate any specific tasks to the Executive Director, as the 2008 Roles and Responsibilities document did when it provided, *inter alia*, that the Executive Director "[m]aintain the Federal Voter Registration Form consistent with the NVRA and EAC Regulations and policies." *Compare* AR00226–29 *with* AR0209–16. At the meeting in which the Commissioners adopted the 2015 Policy Statement, Commissioner Hicks, then Vice-Chair of the Commission, stated, "I and my fellow Commissioners agree that [the 2015 Policy Statement] continues to instruct the Executive Director to continue maintaining the federal form consistent with the Commissioners' past directives, unless and until such directions were counter made should the agency find itself again without a quorum." AR0860.

Due to this near-constant fluctuation of procedures for processing state instruction requests, the Court cannot draw conclusions from the Commission's practices as revealed in the record. The HAVA and the NVRA are silent on the procedures for evaluating state

instruction requests, and, as the record demonstrates, deadlock—or perhaps dysfunction—has prevented the Commission from adopting any relevant implementing regulations that would shed light on the subdelegation issue. Thus, the Court is left with only the 2015 Policy Statement. The federal defendants state that "the choice not to list specific tasks for the Executive Director" in the 2015 Policy Statement "did not remove those responsibilities" set forth in the 2008 Roles and Responsibilities document including the responsibility of maintaining the Federal Form. Defs.' Mem. 11; *see also* PILF's Mem. 22–23.[4] But regardless of the level of deference it warrants, this litigating position is not much help. From 2008 to 2010, a time in which the 2008 Roles and Responsibilities document was in effect and explicitly delegated to the Executive Director the authority to maintain the Federal Form, the Commissioners voted on every requested modification to the state-specific instructions. AR0217, AR0219–20. Thus, even if the Executive Director continued to possess the delegated authority to "maintain" the Federal Form under the 2015 Policy Statement, it is far from clear that authority included the power to approve or reject requests related to changes to the state-specific instructions.[5] Defendant-intervenor PILF argues that evaluating individual States' requests is not "policymaking" and therefore is not part of that function that the Commissioners reserved for themselves in the 2015 Policy

---

[4]     Plaintiffs argue to the contrary, stating the 2015 Policy Statement rescinds the Executive Director's subdelegated authority to maintain the Federal Form. Pls.' Mem. 24.

[5]     Analyzing the 2008 Roles and Responsibilities document, the Court of Appeals for the Tenth Circuit found that "maintenance" of the Federal Form necessarily included some authority to make decisions "concerning the contents" of the form. *Kobach*, 772 F.3d at 1191. In doing so, the Court relied on the EAC's litigating position to that effect. *Id.* The EAC has staked no such position in this litigation. Instead its counsel have persisted that the Court should not reach the issue. Defs.' Mem. 23. Moreover, the Tenth Circuit did not grapple with the significance of the Commissioners themselves continuing to vote on States' requests after the 2008 Roles and Responsibilities document was in effect.

Statement. PILF Mem. 21–22. That position appears to be in line with Newby's view that he was not wading into a "policy" matter when approving the requests. AR0003–04.[6] But it is not clear that making determinations regarding modifications to the state-specific instructions amounts to "tak[ing] responsibility for administrative matters" as the Executive Director is authorized to do. AR0227; *cf. Exxon Corp. v. F.T.C.*, 665 F.2d 1274, 1279 (D.C. Cir. 1981) (recognizing that implicit subdelegation of authority to conduct a specific task can be found where that task is "necessarily include[d]" in a power explicitly subdelegated). This is especially true in light of evidence in the record that over the years some Commissioners and Commission staff have expressed the view that some requests for modification of the state-specific requests are clear-cut, routine while others are anything but. AR0555–79; AR0700; AR0737–38; AR0776.

It is also unclear that approving, or denying, requests actually amounts to "implement[ing] policies," made by the Commissioners, AR0227, as the Executive Director has the delegated authority to do. The 2015 Policy Statement describes "policymaking" as "setting an overall agency mission, goals and objectives, or otherwise setting rules, guidance or guidelines." AR0227. The Commissioners have *never* adopted or issued generally applicable guidelines regarding state-specific instructions. Instead,

---

[6] Defendant-intervenor Secretary Kobach argues that Newby's statements describing his understanding of his authority under the 2015 Policy Statement constitute an agency interpretation that warrant *Auer* deference. Kobach's Mem. 29–30 (citing *Auer v. Robbins*, 519 U.S. 452 (1997)). But one of the prerequisites for *Auer* deference is that there be "no basis to suspect that the agency's position represents anything less than its considered opinion." *Bigelow v. Dep't of Def.*, 217 F.3d 875, 878 (D.C. Cir. 2000). Given that the claim here is that Newby acted outside his subdelegated authority, the Court finds that there a reason to suspect a memorandum authored by Newby and justifying his actions does not constitute the considered judgment of the Commission itself on the topic of the scope of Newby's authority.

they have only voted in an *ad hoc* manner on specific pending requests.  Plaintiffs persist

that the Commissioners previous vote on Arizona's state instruction requests form part of

the body of the Commission's "policy" towards documentary proof of citizenship state

instruction requests.  Pls.' Mem. 27.[7]  But it is not clear from the 2015 Policy Statement

that the Commissioners engage in "policymaking," as defined in the statement, when they

vote on any given state instruction request.  The statement does not clarify whether such a

vote would constitute setting a mission, goals, objectives, rules, guidance, or guidelines,

especially given the fact that the Commissioners did not issue joint statements or

explanations along with their votes.  *See* AR0227  Indeed, their votes on state instruction

requests regarding documentary proof of citizenship were deadlocked, and it is far from

apparent from the 2015 Policy Statement that a deadlocked vote constitutes "mak[ing]

policy through the formal voting process."  AR0227.

For all these reasons, the 2015 Policy Statement is ambiguous.  Generally, when an

agency's own rule or regulation is ambiguous, the agency's interpretation is "give[n]

substantial deference."  *Confederated Tribes of Grand Ronde Cmty. of Oregon v. Jewell*,

830 F.3d 552, 559 (D.C. Cir. 2016).  "Logic suggests that this rule should apply with even

---

[7]     They also argue that previous Executive Directors' actions on state instruction requests regarding documentary proof of citizenship are evidence of the Commission's policy.  But in Count II, the analysis hinges on whether Newby exceeded the scope of his subdelegation. Pls.' Mem. 23–30.  Thus the focus is on whether he exceeded his own authority or encroached the Commissioners' role as set forth in the 2015 Policy Statement.  That document states that policymaking is the function of the *Commissioners* and that the Executive Director is to implement the *Commissioners*' policies.  AR0227.  It does not state that "policymaking" has previously been conducted by Executive Directors or the current Executive Director is to implement the "policies" of any previous Executive Director.  Whether Newby was obligated to explain his departure from any relevant EAC *precedent* on the issue of documentary proof of citizenship state instruction requests, including actions previous Executive Directors, goes to the separate question of whether his analysis passes muster under the APA' reasoned decisionmaking requirements.  That question is therefore properly reached in Counts III and IV and not in Count II.

greater force, where, as here, the agency is neither exercising legislative rulemaking authority nor interpreting a statute, but rather issuing rules governing its own internal operations." *Grossman v. United States*, 57 Fed. Cl. 319, 326 (2003). The Commission has expertise and insight that makes it better situated to interpret the meaning of its ambiguous organizational directive than is this Court, and it would therefore be imprudent for me to impose my own interpretation at this juncture. But in order to afford substantial deference to a reasonable interpretation set forth by the Commission, the Commission must first adopt one. Mindful of the ordinary practice, under which the court remands to the agency after identifying statutory ambiguity in order for the agency to make an initial interpretation, *see INS. v. Orlando Ventura*, 537 U.S. 12, 16–17 (2002); *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 798 (D.C. Cir. 2004), I have concluded that a remand is indeed warranted here. Put simply, remand, as opposed to supplemental briefing, is necessary to ensure the *Commission*—not Government counsel—brings its expertise and insight to bear.[8] On remand, the Commission will have the opportunity to provide a reasonable interpretation of the Executive Director's authority to grant and deny state instruction requests under the 2015 Policy Statement. The Commission's interpretation, at a minimum, should address the facets of ambiguity discussed above, including whether deadlocked votes of the Commission constitute "policymaking" and whether approving

---

[8]     Given plaintiffs' lack of objection on procedural grounds to the adoption of the 2015 Policy Statement, the Court is satisfied that the Commission's interpretation of the ambiguous language in that document on remand will not require notice and comment rulemaking.

and denying state instruction requests is an administrative task, a policy implementation function, or neither.

## CONCLUSION

For all the foregoing reasons, the Court hereby REMANDS to the Election Assistance Commission Newby's grants of Kansas's, Alabama's, and Georgia's requests to include their documentary proof of citizenship requirements in their state-specific instructions on the Federal Form. Because remand is appropriate for the disposition of a threshold issue, the Court defers ruling on the merits of the parties' cross-motions for summary judgment. *See In re Polar Bear Endangered Species Act Listing & 4(d) Rule Litig.*, 748 F. Supp. 2d 19, 22 (D.D.C. 2010); *cf. In re Checkosky*, 23 F.3d 452, 463 (D.C. Cir. 1994) (noting that "reviewing courts will often and quite properly pause before exercising full judicial review and remand to the agency for a more complete explanation of a troubling aspect of the agency's decision"). The Court will stay this case during the remand period, but, as the case will still be pending, the preliminary injunction will remain in place. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 15 (D.C. Cir. 2016) (issuing a preliminary injunction to remain in place "pending entry of the final judgment"). The federal defendants shall file the Commission's explanation and any supporting materials on or before June 1, 2017. Within fourteen days (14) of the filing, the parties shall confer and file a joint proposed schedule for any supplemental briefing.

RICHARD J. LEON
United States District Judge

19