UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEAGUE OF WOMEN VOTERS OF THE UNITED STATES, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> MONA HARRINGTON, *et al.*, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

Civil Case No. 16-00236 (RJL)

MEMORANDUM OPINION
(September 16, 2021) [Dkts. #101, #103, #105, #107]

Plaintiffs bring this action under the Administrative Procedure Act ("APA") alleging that in 2016 the then-Executive Director of the Election Assistance Commission ("EAC" or "Commission"), Brian Newby,[1] acted outside of his authority and in violation of the APA when he granted Kansas's, Georgia's, and Alabama's (collectively the "States") requests to modify the National Mail Voter Registration Form (the "Federal Form") to include documentary proof of citizenship ("DPOC") instructions for prospective voters. Currently pending before the Court are the parties' cross-motions for summary judgment. Upon consideration of the parties' briefing, the submissions of *amici curiae*, the relevant law, and the entire record herein, I agree with plaintiffs that Newby failed to apply the appropriate statutory standard in approving the States' requests and therefore

---

[1] Mona Harrington, the current Executive Director, has been automatically substituted for Newby under Rule 25 of the Federal Rules of Civil Procedure.

1

violated the APA. Accordingly, I GRANT plaintiffs summary judgment on Count V of their Complaint,[2] VACATE the contested decisions, and REMAND to the Commission to reconsider Georgia's and Alabama's requests under the appropriate standard.[3]

## BACKGROUND[4]

In 1993, Congress enacted the National Voter Registration Act ("NVRA"), which directed the Federal Election Commission ("FEC") to create a uniform federal form to register voters for federal elections by mail. *See* 52 U.S.C. § 20508(a)(2). That form, colloquially known as the Federal Form, contains general registration instructions for all applicants as well as state-specific instructions for each individual state. *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 5–7 (2013) (hereinafter "*ITCA*"). States must "accept and use" the Federal Form to register voters for federal elections. *See* 52 U.S.C.

---

[2] Previously in this litigation, I suggested a narrow disposition may be possible through addressing solely Counts I and II of the Complaint regarding the Executive Director's authority. Mem. Op. [Dkt. #133] at 8–9. Unfortunately, that path has been foreclosed by the Commission, which, after a remand to it to "provide a reasonable interpretation of the Executive Director's authority to grant and deny state instruction requests," *id.* at 18–19, failed to produce an answer. Although the Commissioners considered and voted on the matter, no three Commissioners agreed on the critical issue of whether Newby possessed the authority to render the decisions at issue here. *See* EAC Tally Vote and Mem. [Dkt. #141-1]. Accordingly, the ambiguity and uncertainty surrounding the Executive Director's authority remains. *See* Mem. Op. [Dkt. #133] at 8–18; *see also* 52 U.S.C. § 20928 (requiring the votes of three Commissioners for any action by the EAC). Thankfully, the Court need not settle this internal dispute for the agency. Instead, it can provide a narrow disposition of this case by examining only Count V of the Complaint. Although the Court recognizes this approach may potentially lead to further administrative gridlock and, possibly, further litigation, this path is preferable to intruding on the expertise of the agency in interpreting its internal operational rules until absolutely necessary. *See Whitehouse v. Ill. Cent. R. Co.*, 349 U.S. 366, 372–73 (1955).

[3] In *Fish v. Schwab*, the Tenth Circuit held the proof of citizenship requirement that precipitated Kansas's request to the EAC unconstitutional and permanently enjoined Kansas from enforcing the statute and associated regulation. 957 F.3d 1105, 1134–36 (10th Cir. 2020), *cert. denied* 141 S. Ct. 965 (Dec. 14, 2020). Accordingly, Kansas's request may not be renewed or otherwise reconsidered.

[4] The background of this case has been discussed at length in prior Opinions of this Court and our Circuit Court. *See* Mem. Op. [Dkt. #92]; Mem. Op. [Dkt. #133]; *see also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 4–6 (D.C. Cir. 2016). Only the limited background necessary for the present disposition is repeated here.

§ 20505(a). Regardless of how a state approaches voter registration for its own elections, it cannot decline to register for federal elections an applicant who timely completes and submits a Federal Form.[5] *ITCA*, 570 U.S. at 10–13. As the Supreme Court described the process: "States retain the flexibility to design and use their own registration forms, but the Federal Form provides a backstop: No matter what procedural hurdles a State's own form imposes, the Federal Form guarantees that a simple means of registering to vote in federal elections will be available." *ITCA*, 570 U.S. at 12.

In 2002, Congress passed the Help America Vote Act ("HAVA"), which transferred authority to "develop" the Federal Form from the FEC to the newly created EAC. *See* 52 U.S.C. §§ 20508, 20921. The EAC is compromised of four Commissioners, two from each major political party. *See* 52 U.S.C. § 20923(a), (b). The Commission may act "only with the approval of at least three of its members." 52 U.S.C. § 20928. Thus, generally, any act of the Commission requires bipartisan support.

Like its predecessor, the EAC must develop the Federal Form "in consultation with the chief election officers of the States." 52 U.S.C § 20508(a)(2). As states change voter registration criteria, they may request changes to the corresponding state-specific instructions on the Federal Form. But each state-specific instruction must be approved by the EAC before it is included. *ITCA*, 570 U.S. at 6.

---

[5] While the general rule is that a complete and valid Federal Form must be accepted as sufficient to register an applicant, there are exceptions. For example, where a state possesses information that an applicant is not a U.S. citizen or fails to meet another eligibility requirement, the state may deny registration. *See ITCA*, 570 U.S. at 15.

Congress regulated this approval process by stating,

> [The Federal Form] may require only such identifying information (including the signature of the applicant) and other information (including data relating to previous registration by the applicant), *as is necessary* to enable the appropriate State election official to assess the eligibility of the applicant and to administer voter registration and other parts of the election process.

52 U.S.C. § 20508(b)(1) (emphasis added). As our Circuit Court has stated, this provision "at once requires and restricts the inclusion of certain information on the Federal Form." *League of Women Voters*, 838 F.3d at 5; *see also ITCA*, 570 U.S. at 19 (holding the statute "acts as both a ceiling and a floor with respect to the contents of the Federal Form").

On January 29, 2016, then-Executive Director Newby approved three requests to amend the state-specific instructions on the Federal Form. *See* AR0063–64, 70–71, 109–10. Specifically, he granted Kansas's, Georgia's, and Alabama's requests to include instructions regarding their respective state laws requiring voter registration applicants to prove citizenship through documentary proof or alternative processes.[6] *Id.*

Newby's approval letters did not contain any explanation regarding his decisions. In a roughly contemporaneous internal memorandum dated February 1, 2016, however,

---

[6] The Federal Form at the time already included certain information regarding the necessity of being a U.S. citizen in order to register to vote. For example, the general instructions explained that "[a]ll States require that you be a United States citizen by birth or naturalization to register to vote in federal and State elections. Federal law makes it illegal to falsely claim U.S. citizenship to register to vote in any federal, State, or local election." AR0034. Applicants also were required to affirmatively represent their citizenship status. In the portion of the form where the applicant fills in his or her information, the first question required the applicant to check the box for "yes" indicating that they were "a citizen of the United States." AR0036. In bold letters, the form indicated that "[i]f you checked 'No' . . . do not complete form." *Id.* Then, in a separate portion, an applicant was required to sign their name and "swear/affirm" that they were a "United States citizen." *Id.*

Newby elaborated on his reasoning for approving the States' requests.[7] AR0001–07. Newby stated that, in his view, "the role and rights of the states" include "set[ting] the framework for acceptance and completion of the [Federal] form." AR0005. He described "[s]tate-specific instructional changes" as "ministerial, and thus, routine," and, as a result, concluded that "[t]he Executive Director [was to] review the request[s] for clarity and accuracy." AR0002. Based on this reasoning, Newby examined only whether the States' requests were uniformly applied to all voters and accurately reflected state law regarding registration requirements. AR0004. In approving the States' requests, he explicitly clarified that "while proof of citizenship will be the focal point many will place upon these requests, it's not the issue I am evaluating," AR0004, and found that the examples put forward by Kansas to demonstrate the "need" for the requested changes were "irrelevant to [his] analysis." *Id.*

Litigation ensued almost immediately after Newby's decisions. On February 12, 2016, plaintiffs filed the instant Complaint alleging five Counts: (I) that pursuant to Section 208 of HAVA, the States' requests could be granted, if at all, only by approval of three Commissioners and thus Newby's decisions exceeded his statutory authority, Compl. ¶¶ 70–74; (II) that Newby's decisions constituted a reversal of the Commission's policy as to DPOC requirements and that he therefore exceeded the scope of his

---

[7] Several weeks after his memorandum and after litigation ensued, Newby issued a declaration further explaining his decisions. Declaration of Brian Dale Newby ("Newby Decl.") [Dkt. #28-2]. There, he reiterated his view that "state-specific voter instructions should be accepted if they were duly passed state laws affecting the state's registration process." *Id.* ¶ 25. He also averred that he approved the requests at issue here "[a]fter determining that the changes to the state-specific instructions were necessary and proper." *Id.* ¶ 48.

delegated authority as set forth in a 2015 Policy Statement, Compl. ¶¶ 75–82; (III) that Newby's decisions violated the APA because the agency was required to undergo notice and comment rulemaking prior to approving the requests, Compl. ¶¶83–86; (IV) that Newby's failure to provide an explanation for his decision to depart from what plaintiffs claim to be a "longstanding policy and legal determination that documentary proof of citizenship was not 'necessary' within the meaning of the NVRA" was contrary to law, an abuse of discretion, and arbitrary and capricious in violation of the APA, Compl. ¶¶ 87–91; and (V) that Newby's failure to determine that the States' requested instructions were "necessary" under the NVRA before approving the requests was contrary to law, an abuse of discretion, and arbitrary and capricious in violation of the APA, Compl. ¶¶ 92–96.

On February 17, 2016, plaintiffs moved for a temporary restraining order and preliminary injunction. Mot. for TRO and Prelim. Inj. [Dkt. #11]. Federal defendants consented, taking the position that the 2016 decisions could not be upheld on the merits because Newby violated the APA by failing to make the necessity determination required by the NVRA. Defs.' Resp. to Pls.' Mot. for TRO and Prelim. Inj. [Dkt. #28] at 10–11. I subsequently permitted the Kansas Secretary of State ("Kansas Secretary") and Public Interest Legal Foundation ("PILF") (collectively "intervenor-defendants") to intervene to defend Newby's decisions on the merits. Then, on February 23 and June 29, 2016 respectively, I denied plaintiffs' motions for a temporary restraining order and preliminary injunction. *See* Mem. Order [Dkt. #34]; Mem. Op. and Order [Dkts. ##92, 93].

Plaintiffs appealed, and our Court of Appeals issued a preliminary injunction, requiring the Commission to "take all actions necessary to restore the status quo ante, pending a determination on the merits." *League of Women Voters of U.S. v. Newby*, F. App'x 820, 821 (D.C. Cir. Sept. 9, 2016). In a subsequently issued opinion, the split panel elaborated on its decision by holding that plaintiffs had shown likely irreparable harm as well as a "substantial (perhaps overwhelming) likelihood of success on the merits" with respect to Count V of plaintiffs' Complaint. *League of Women Voters*, 838 F.3d at 7–10.

During the pendency of the appeal, the parties litigated cross-motions for summary judgment, which are now fully ripe and resolved herein. Plaintiffs move for summary judgment on all five Counts. *See generally* Pls.' Cross-Mot. for Summ. J. ("Pls.' Mot.") [Dkt. #103]. Federal defendants maintain their concession that Newby violated the APA—and therefore contend plaintiffs are entitled to summary judgment on Counts IV and V—but urge the Court not to address the remaining Counts. *See* Defs.' Mot. for Summ. J. ("Defs.' Mot.") [Dkt. #101] at 1–2. Intervenor-defendants, on the other hand, argue that summary judgment is warranted in their favor on all Counts because Newby's actions were lawful and survive APA scrutiny.[8] Def.-Intervenor PILF's Cross-Mot. for

---

[8] The parties also make numerous standing arguments. *See* PILF's Mot. at 11–15; Kansas's Mot. at 12–13; Fed. Defs.' Supp. Mem. in Support of Fed. Defs.' Mot. for Summ. J. [Dkt. #172] at 3–7; Pls.' Reply to Resp. of Def.-Intervenor to Order to Show Cause [Dkt. #181] at 1. In permitting the Kansas Secretary and PILF to intervene as defendants, I necessarily found they possessed Article III standing to do so. *See Crossroads Grassroots Pol'y Strategies v. FEC*, 788 F.3d 312, 316 (D.C. Cir. 2015). I also previously held that at least "the League of Women Voters of Georgia, the League of Women Voters of Kansas, and the League of Women Voters of Alabama . . . met their burden to demonstrate organizational standing." Mem. Op. [Dkt. #92] at 15. While superseding events have cast some doubt on the continued standing of at least the Kansas Secretary and the Kansas-related plaintiffs, *Fish*, 957 F.3d at 1134–36 (striking down the Kansas DPOC statute that precipitated Kansas's request to the EAC as unconstitutional), there is no

Summ. J. ("PILF's Mot.") [Dkt. #105] at 17–32; Def-Intervenor Kobach's Mem. of P. & Auth. in Supp. of His Cross-Mot. for Summ. J. ("Kansas's Mot.") [Dkt. #107-1] at 13–39.

## DISCUSSION

Under the APA, courts must "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Arbitrary and capricious review is "narrow." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A court may not substitute its judgment for that of the agency. *Id.* But courts must ensure that "the agency . . . examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Id.*

Courts look to whether "the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Bowman Transp. Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974). An agency decision will fail under arbitrary and capricious review where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view

---

need to revisit the standing of every party at this time. *See Ry. Labor Execs.' Ass'n v. United States*, 987 F.2d 806, 810 (D.C. Cir. 1993) ("[I]f one party has standing in an action, a court need not reach the issue of the standing of other parties when it makes no difference to the merits of the case."). Because I am satisfied that, as previously held, at least the League of Women Voters of Georgia and the League of Women Voters of Alabama maintain standing, *see* Mem. Op. [Dkt. #92] at 13–18; *League of Women Voters*, 838 F.3d at 9, I will proceed to the merits without further analysis.

or the product of agency expertise." *State Farm*, 463 U.S. at 43. While courts will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned," *Bowman Transp.*, 419 U.S. at 286, courts may not make up for agency deficiencies by supplying a reasoned basis for the disputed action where the agency has failed to supply one. *Id.*

Plaintiffs and federal defendants argue that in approving the States' requests, Newby failed to make a finding that the proposed instructions were "necessary to enable the [States] to assess the eligibility of [] applicant[s] and to administer voter registration and other parts of the election process" as required by the NVRA. Defs.' Mot. at 14 (quoting 52 U.S.C. § 20508(b)(1)); Pls.' Mot. at 37–41. This failure, they contend, renders the 2016 decisions arbitrary and capricious under the APA. *See* Supp. Mem. in Support of Pls.' Cross-Mot. for Summ. J. [Dkt. #119] at 4–8; Pls.' Mot. at 41. Intervenor-defendants counter that Newby's decisions complied with the NVRA, were justified by record evidence demonstrating the necessity of the States' proposed instructions, and were compelled by an FEC regulation and constitutional concerns. *See* Kansas's Mot. at 13–40; PILF's Mot. at 29–33. Unfortunately for intervenor-defendants, I agree with plaintiffs and federal defendants that Newby violated the APA by failing to apply the appropriate legal standard in approving the States' requests. How so?

The administrative record shows Newby proceeded under a mistaken view—that neither he nor the EAC was required to make a necessity determination under the NVRA prior to approving the States' requests. *See* AR0001–05. In his roughly contemporaneous memorandum, Newby explains that he approved the requests because he viewed the States

as possessing the authority to "set the framework for acceptance and completion of the [Federal] form." AR0005. The memorandum makes clear that so long as the requested instructions accurately reflected valid state laws affecting voter registration, Newby viewed the EAC as bound to approve the requests without analyzing whether the proposed instructions were "necessary to enable the [State] to assess the eligibility of the applicant," 52 U.S.C. § 20508(b)(1). *See* AR0002 (describing the agency's role as "ministerial" and stating that his review encompassed only an analysis of the proposed instruction's "accuracy and clarity"). Indeed, Newby explicitly refused to consider the examples Kansas submitted demonstrating the State's supposed "need for the changes," rejecting such potential evidence of necessity as "irrelevant to [his] analysis." AR0004.

The NVRA, as interpreted by the Supreme Court and our Circuit Court, demands something more. In *ITCA*, the Supreme Court interpreted the relevant statutory language as requiring a necessity determination by the EAC prior to updating the instructions accompanying the Federal Form in response to a state's request. 570 U.S. at 5, 18–20. The Court specifically rejected a contrary reading of the statute that "would permit a State to demand of Federal Form applicants every additional piece of information the State requires on its state-specific form." *Id.* at 13; *see also League of Women Voters*, 838 F.3d at 10. Because Newby failed to make—and indeed, explicitly repudiated the requirement that he make—a necessity determination prior to approving the States' requests, his decisions failed to comport with the statutory requirements of the NVRA and therefore violated the

10

APA.[9] *See State Farm*, 463 U.S. at 43. As our Circuit Court previously found in reviewing the preliminary injunction decision in this case, "it is difficult to imagine a more clear violation of the APA's requirement[s]." *See League of Women Voters*, 838 F.3d at 10.

Intervenor-defendants resist this conclusion, but none of their arguments succeeds. First, intervenor-defendants challenge plaintiffs and federal defendants' proposed reading of *ITCA*. *See* PILF's Mot. at 30. They contend "[t]he Supreme Court . . . made clear that . . . the determination of necessity does not reside with the EAC, but resides with the States." *Id.* Not so. As our Circuit Court and the Tenth Circuit have held, the *ITCA* decision, read as a whole, supports plaintiffs and federal defendants' position that *the agency* must make the necessity determination. *See ITCA*, 570 U.S. at 5, 15–20; *see also League of Women Voters*, 838 F.3d at 10 ("In *ITCA*, the Court made plain that the Commission, not the states, determines necessity."); *Kobach v. U.S. Election Assistance Comm'n*, 772 F.3d 1183, 1196 (10th Cir. 2014) (holding the Court's decision in *ITCA* "would make no sense if the EAC's duty [to approve states' requests] was nondiscretionary" and triggered merely by a "state['s] averment that [its] requested text is necessary"). Were it otherwise, a state would have the ability to require Federal Form applicants to include every piece of information the state required on its state-specific form and, in the process, render the NVRA "a feeble means of" achieving its purpose— "increas[ing] the number of eligible citizens who register to vote in elections for Federal

---

[9] The Court need not define the precise contours of a necessity determination under the NVRA to reach this conclusion. It is sufficient to hold that where, as here, the Commission explicitly refuses to consider evidence submitted to demonstrate the supposed "need" for the proposed changes, *see* AR0002–04, it has failed to comply with the statute.

office."[10] *See ITCA*, 570 U.S. at 13 (quoting 52 U.S.C. § 20501(b)(1)).

Next, intervenor-defendants argue that under the doctrine of constitutional avoidance, the Court must adopt their proposed reading of the NVRA. *See* Kansas's Mot. at 19–22; *see also* Supp. Br. on Summ. J. of Def.-Intervenor Kansas Sec. of State Kris Kobach ("Kansas's Supp. Br.") [Dkt. #122] at 8. Were this Court writing on a blank canvas, this argument may have significant force. As I previously noted, serious constitutional concerns regarding the balance of election-regulation authority are implicated by this case.[11] *See* Mem. Op. [Dkt. #133] at 8–9 (noting the "thorny . . . constitutional questions" at issue). Unfortunately for intervenor-defendants, however, their argument has already been put to, and rejected by, several courts, including our Circuit Court and the Tenth Circuit. *See League of Women Voters*, 838 F.3d at 9–12; *Kobach*,

---

[10] The Kansas Secretary's reliance on a FEC regulation, 11 C.F.R. § 9428.4(b), fails for a similar reason. The Kansas Secretary argues that the regulation—which states the Federal Form "shall list U.S. Citizenship as a universal eligibility requirement and include a statement that incorporates by reference each state's specific additional eligibility requirements"—compels Newby's approval of the States' requests and deprives the EAC of any discretion in the decision. *See* Kansas's Mot. at 25–26. But this interpretation is squarely foreclosed by the reasoning of *ITCA* and our Circuit Court's prior decision in this case. *See ITCA*, 570 U.S. at 13; *League of Women Voters*, 838 F.3d at 10.

[11] The constitutional concerns arise in this case from the fear that the federal government may encroach upon the states' rights to establish voter qualifications. The Elections Clause empowers states to prescribe the "[t]imes, [p]laces, and [m]anner of electing federal representatives, but confers on Congress the power to preempt those regulations. *ITCA*, 570 U.S. at 8; Art. I, § 4, cl. 1. As the Supreme Court has held, "[t]ime, place, and manner," as used in the Clause, are "comprehensive words" that "embrace authority to provide a complete code for congressional elections," including regulations relating to voter registration. *ITCA*, 570 U.S. at 8–9 (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)). Notwithstanding this Congressional authority, however, Article I and the Seventeenth Amendment preserve for the states the authority to set qualifications for electors. *Compare* U.S. Const. Art. I, § 2, cl. 1 *with id*. Art. I, § 4, cl. 1. As the Supreme Court put it, "the Elections Clause empowers Congress to regulate *how* federal elections are held, but not *who* may vote in them." *ITCA*, 570 U.S. at 16. As relevant here, intervenor-defendants argue that if the EAC may decide what information is "necessary" to assess voter eligibility under the NVRA, the federal government will effectively be able to alter voter qualifications under the guise of time, place, and manner regulations. *See* Int.-Def. PILF's Supp. Br. ("PILF's Supp. Br.") [Dkt. #120] at 7.

772 F.3d at 1194–96; *see also Fish v. Kobach*, 840 F.3d 710, 718 (10th Cir. 2016); *Fish v. Schwab*, 957 F.3d 1105, 1139–41 (10th Cir. 2020). Both appellate courts held that the EAC's discretion to determine necessity under the NVRA and reject unsubstantiated state instruction requests does not run afoul of constitutional constraints. *League of Women Voters*, 838 F.3d at 10–12; *Kobach*, 772 F.3d at 1195–96. Indeed, both courts recognized that the constitutional argument presented by intervenor-defendants was effectively rejected by the majority in *ITCA*. *See League of Women Voters*, 838 F.3d at 11 ("[T]he interpretation advanced by [intervenor-defendants] is that reflected in Justice Alito's dissenting opinion, additional evidence that the *ITCA* majority considered and rejected that reading."); *Kobach*, 772 F.3d at 1188 ("This is one of those instances in which the dissent clearly tells us what the law is not."). Accordingly, I must reject intervenor-defendants' constitutional arguments.[12]

Next, relying on Newby's declaration that was created and filed in this Court several weeks *after* litigation ensued, intervenor-defendants argue Newby actually did

---

[12] Intervenor-defendants argue in favor of disregarding our Circuit Court's decision, *see* Kansas's Supp. Br. at 8–13; PILF's Supp. Br. at 2–4, but our Circuit's holdings on the legal issues discussed here are likely binding on this Court. 18B CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE § 4478.5 ("A fully considered appellate ruling on an issue of law made on a preliminary injunction appeal . . . does become the law of the case for further proceedings in the trial court."); *see also Sherley v. Sebelius*, 689 F.3d 776, 782–83 (D.C. Cir. 2012). Intervenor-defendants suggest the decision was "clearly erroneous" in its constitutional analysis and therefore may be cast aside, Kansas's Supp. Br. at 3 (citing *LaShawn A. v. Berry*, 87 F.3d 1389, 1393 (D.C. Cir. 1996), but this is hardly the case. Although the constitutional implications of the NVRA have generated significant controversy and numerous dissenting opinions, *see ITCA*, 570 U.S. at 22 (Thomas, J. dissenting); *Id.* at 38 (Alito, J. dissenting); *League of Women Voters*, 838 F.3d at 15 (Randolph, J. dissenting), disagreement alone does not constitute the "extraordinary circumstances" necessary to reconsider issues already decided. *See LaShawn A.*, 87 F.3d at 1393. Moreover, no appellate court has yet adopted intervenor-defendants' constitutional argument, and several have explicitly rejected it. Accordingly, our Circuit Court's analysis is far from "clearly erroneous."

make the necessity determination required by the NVRA. *See* PILF's Mot. at 32. Newby's declaration, however, must be disregarded as it is little more than a post-hoc rationalization of the type routinely rejected by courts in APA proceedings. *Ass'n of Civilian Technicians v. Fed. Labor Rels. Auth.*, 269 F.3d 1112, 1117 (D.C. Cir. 2001) ("Agency decisions must generally be affirmed on the grounds stated in them . . . Post-hoc rationalizations, developed for litigation are insufficient."); *see also Camp v. Pitts*, 411 U.S. 138, 143 (1973) (holding where a "contemporaneous explanation of the agency decision" "indicate[s] the determinative reason for the final action," the action's validity "must . . . stand or fall on the propriety of that finding"). Excluding Newby's self-serving declaration, the record lacks any evidence of the necessity determination required by the NVRA. It is on this record that the agency's determination must be reviewed.

Finally, the Kansas Secretary argues that the second clause of § 20508(b)(1) justifies Newby's decisions. That is, even if Kansas's proposed instructions were not necessary "to enable the appropriate State election official to assess the eligibility" of applicants, the Kansas Secretary contends they were necessary to "administer voter registration and other parts of the election process." *See* Kansas's Mot. at 13–14 (quoting 52 U.S.C. § 20508(b)(1)). Unfortunately for the Kansas Secretary, however, the record lacks any evidence of such a finding on behalf of the agency.[13] Just as it does with intervenor-defendants' primary APA argument, the absence of a necessity determination with respect to the second prong of §20508(b)(1) similarly precludes the Court from

---

[13] This absence is not surprising considering that Kansas framed its request to the EAC by describing its proposed instructions as "necessary to enable Kansas county election officers to assess the eligibility of an applicant." AR0073.

upholding the agency's decisions on that basis. *Bowman Transp.*, 419 U.S. at 285–86.

In light of Newby's failure to apply the correct legal standard, the appropriate course is to vacate the contested decisions and remand to the agency to reconsider the States' requests. *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *PPG Indus. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards."). Intervenor-defendants urge this Court, in lieu of vacating and remanding, to either find the States' proposed instructions necessary based on evidence submitted in the course of this litigation or order additional explanations from the agency. *See* PILF's Supp. Br. at 9; Kansas's Supp. Br. at 15–17. Neither alternative, however, is warranted. Simply put, intervenor-defendants put forward *no* authority justifying a departure from the ordinary remedy available in APA cases, and it would be inappropriate at this juncture to substitute the Court's judgment on the issue of necessity for that of the agency. *See LaRouche's Comm. for a New Bretton Woods v. FEC*, 439 F.3d 733, 737 (D.C. Cir. 2006).

## CONCLUSION

For all of the foregoing reasons, the Court GRANTS federal defendants' motion for summary judgment and plaintiffs' cross-motion for summary judgment with respect to Count V of the Complaint; DENIES intervenor-defendants' cross-motions for summary judgment; VACATES the Commission's 2016 decisions approving Kansas's,

15

Georgia's, and Alabama's requests to modify the state-specific instructions of the National Mail Voter Registration Form; and REMANDS this case to the Commission to reconsider Georgia's and Alabama's requests consistent with this Memorandum Opinion, to the extent those States continue to seek the state-specific instructions at issue here. An Order consistent with this decision accompanies this Memorandum Opinion.

_____
RICHARD J. LEON
United States District Judge